JULIA I. MANELA, OSB#023771
Email: jmanela@wlrlaw.com
WATKINSON LAIRD RUBENSTEIN, P.C.
Attorneys at Law
1203 Willamette Street, Suite 200
PO Box 10567
Eugene, OR 97440
Telephone: 541-484-2277

Of Attorneys for Creditor PacWest Funding Inc.,
dba Precision Capital, agent for PC0120N Joint Venture

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| In re | Case No. 23-30250-thp11 (Lead Case) |
| RODA, LLC | 23-30159-thp11 |
| And | **MOTION TO APPOINT CHAPTER 11 TRUSTEE** |
| Roy MacMillan | |
| Debtors-in-Possession. | |

PacWest Funding Inc., dba Precision Capital (**PacWest**), moves the Court for an order appointing a Chapter 11 trustee to assume control of the RODA estate pursuant to 11 USC § 1104 (a)(1) & (2), or in the alternative to convert both cases to Chapter 7. There are no disputes over the facts regarding control and management of the jointly administered Debtors, nor any dispute over the control and management of various tenant entities, including the primary operating entity Oregon Ice Entertainment, Inc. (**OIE**); they are all under the control of Roy MacMillian. Similarly, there is no dispute that RODA, LLC (**RODA**) and Roy MacMillian (**MacMillan**) (collectively, "Debtors") borrowed funds from PacWest and that both loans matured over a year ago. The Chapter 11 cases were filed to stop impending foreclosures by

MOTION TO APPOINT CHAPTER 11 TRUSTEE Page 1 of 9

PacWest. Since that time, there has not been any significant progress made toward selling the property or proposing a plan. The inability to make any progress predates the case filings by at least a year.

MacMillian is unable to fulfill his fiduciary duties due to the Jenga like conflict of interest rendering him incompetent to manage the debtor entities and unable to manage the estates and affairs of RODA. MacMillian cannot be trusted to make decisions that are in the best interests of creditors of the estate, rather than being blinded by his own personal interests tied to the operating entity and other tenants of the RODA. For these reasons, as set forth in more detail below, a trustee is necessary to allow an uninterested party to manage the bankruptcy estates, and it is in the best interest of creditors to do so.

This motion is supported by the concurrently filed Declaration of Lorena Teer (**Teer Dec.**), Declaration of Julia I. Manela (**Manela Dec.**), the courts file herein, the following points and authorities, and such other and further evidence that may be presented to the court at hearing.

## <u>BACKGROUND</u>

1.      On December 30, 2019, MacMillian executed a promissory note in the principal amount of $1,365,000 payable to Precision Capital (**Farm Loan**). The promissory note is secured by property commonly described as 17815 & 17715 NE Courtney Rd, Newberg OR 97132 (**Farm Property**). The promissory note matured on January 1, 2022. *See* POC #10 filed in MacMillan's bankruptcy. The promissory note is guaranteed by RODA, MacMillian, David Flora, and OIE. *See* Exhibit Teer-1 attached to the Teer Dec. The initial Farm Loan payments were made from a reserve, two payments were made and then the loan was in forbearance for three months. Payments were made until April of 2022. *See* POC #10 filed in MacMillan's bankruptcy.

2.      On January 21, 2020, RODA executed a promissory note in the principal amount of $5,682,00.00 payable to Precision Capital (**RODA Loan**). A Trust Deed was recorded on

MOTION TO APPOINT CHAPTER 11 TRUSTEE                    Page 2 of 9

January 22, 2020, securing the obligation with real property commonly referred to as 20407 SW Borchers Dr, Sherwood, OR 97140 (the **Ice Arena**). The RODA Loan funded on January 22, 2020; the February through August payments were made with a reserve established at funding. Subsequently, four more payments were made at which point PacWest agreed to forebear for January through March of 2021. RODA then defaulted by fall 2021. The promissory note terms provide that it was due in full on February 1, 2022. *See* POC #2 filed in RODA bankruptcy. The promissory note is guaranteed by MacMillan and David Flora. *See* Exhibit Teer-2 attached to the Teer Dec.

3.      Both loans were made with the understanding that they were to be short-term financing which would be replaced by longer term financing. *See* Teer Dec. ¶ 4. In September of 2020, as RODA and MacMillian were to be working on refinancing, MacMillian purchased a vehicle for $102,085.84. *See* POC #2 filed by Ford Motor Company, LLC in MacMillan bankruptcy. The Retail Installment contract shows that $90,000 was financed. It can be inferred that the loan was subsequently paid down since the balance on the proof of claim is $19,999.00. That was during the time that RODA was unable to make payments.

4.      After months of discussions, on December 8, 2021, a Notice of Default was sent to the Debtor. *See* Teer Dec. ¶ 5. In response the then attorney responded requesting an extension and indicated that the operations were impacted by the pandemic. *See* Teer Dec. ¶ 6. Subsequently, there were multiple exchanges with the then attorney Sally Leisure that included disclosure of financial information. *See* Exhibit JIM-1, email dated January 21, 2022, indicating that OIE had received an EIDL Loan in the amount of $150,000 attached to the Manela Dec. Representations were made concerning the effort to obtain a refinance. *See* Exhibit JIM-2, email dated February 21, 2022, attached to Manela Dec. The Commercial Center, Inc., a third-party broker, represented to PacWest that exit financing was available if the Debtors would work with them. *See* Exhibit JIM-3, email dated March 4, 2022. On October 15, 2019, the Debtors provided

MOTION TO APPOINT CHAPTER 11 TRUSTEE                    Page 3 of 9

to PacWest a copy of the Agreement for Loan Related Services to assist the members of RODA, LLC in obtaining new financing which was provided to PacWest. See Exhibit Teer-3 Teer Dec.

5.      On June 3, 2022, PacWest recorded a Notice of Default and Election to Sell the Ice Arena based on Debtors' default, setting a foreclosure sale date of October 13, 2022. On August 4, 2022, PacWest recorded an Amended Notice of Default and Election to Sell the Farm Property based on Debtors' default, setting a foreclosure sale date of December 6, 2022. PacWest then agreed to postpone the sale of the Ice Arena after Debtors' representation that a source of refinance had been located and was forthcoming, and/or there was an interested buyer of the Ice Arena. PacWest postponed the Ice Arena sale until December 15, 2022. Again, after discussions with Debtors that efforts were continuing toward either a refinance or a sale, PacWest postponed the Ice Arena sale until February 7, 2023. PacWest simultaneously was moving forward with the foreclosure on the MacMillian Farm Property, which was set for sale and reset along with the RODA foreclosure. In response to PacWest being unwilling to extend any further, the above captioned cases were filed,  MacMillan's on January 25, 2023, and RODA's on February 6, 2023.

6.      RODA schedules show the loan to MacMillian from PacWest as a loan from MacMillan to RODA. The payments to insiders show payments made by RODA to MacMillian on the loan leading up to bankruptcy. *See* RODA Schedules P. Those payments to MacMillian were not used to then pay the debt owed to PacWest.

7.      The members of RODA are MacMillian and David Flora with Ann Fisher holding a minority interest. OIE is owned by MacMillian and David Flora. It appears that all management control for both entities is held by MacMillian. OIE is the primary tenant of RODA. *See* RODA's monthly operating statements. At the date of filing, a significant A/R was owed by OIE to RODA, evidencing that it was in default and had been for some time. *Id*. A number of the other tenants of RODA are entities owned and controlled by MacMillian including:

///

Oregon Hockey Inc (with 3 ABNs)

Tartan House LLC/Growler House

Skate & Skills LLC

*See* RODA Schedules, A/R Aging attached to the Monthly Operating Reports filed by RODA, and 341(a) transcript pg 9-13 attached as Exhibit JIM-4 to Manela Dec. Those entities also owe funds to RODA. Although the Debtors retained counsel to examine the leases, there have been no updates or progress made in regard to the leases. It should be noted that there are multiple entities in which  MacMillian has or had an ownership interest which are associated with the Ice Arena address, including one that was established after the foreclosures commenced. *See* Exhibit JIM-5, Oregon Secretary of State Business Search attached to Manela Dec.

8.      David Flora indicated that some of the equipment allegedly owned by OIE or the other entities originally belonged to RODA, raising the possibility of fraudulent transfers of not only finds but of equipment. In addition, PacWest is aware of a lien filed by the SBA on the equipment of OIE. Hilco's report dated October 30, 2023, indicates that uncertainty regarding the operating entity is due in part to the uncertainty about OIE. The report also indicated concern about the collection of league dues by OIE. *See* Exhibit JIM-6, email dated October 30, 2023, attached to Manela Dec.

9.       MacMillian has not provided any indication as to his intent in regard to the Farm Property, which is the primary asset in his personal case securing one of the loans owed to PacWest. PacWest is not receiving any adequate protection payments to protect from diminution in value over time. RODA's most recent monthly operating report shows the company operating at a loss. The operating reports also reflect a failure of RODA to pass on CAM, utility charges and property taxes to OIE. MacMillian testified 71% of those costs should be passed on to OIE in addition to the base rent. His earlier testimony indicated the balance was to be passed on to the other tenants. See 341 (a) transcript p. 27 attached as Exhibit JIM-4 to Manela Dec.

# ARGUMENT

10.    11 U.S.C. § 1104(a) provides:

At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –

(1)    For cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2)    If such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

## A.  Cause Exists for Appointment of a Trustee Under 1104(a)(1).

11.    A debtor-in-possession owes fiduciary duties to the bankruptcy estate and creditors, including the duty to protect and conserve property in its possession for the benefit of creditors, and refrain from acting in a manner which could hinder reorganization or damage the estate. *In re Ionosphere Clubs Inc*, 113 BR 164, 169  (Bankr. S.D.N.Y. 1990). *See also In re Thurmond* (Bankr. Or. 1983).   MacMillian's failure to act is tantamount to acting in manner that damages the estate. It is impossible to meet his fiduciary obligations as the manager of the RODA.  MacMillian has a conflict of interest between retaining control of the non-debtor operating entity, his obligations as the principle of the RODA to pursue the obligation owed by that entity, the potential loss of control on the sale of the real property, the personal liability he faces, his obligation to pursue fraudulent transfers, and his obligation to make decisions in regard to the lease status.  Simply, he cannot objectively wear that many hats.

12.    The only person benefiting from the situation is MacMillian who continues to be paid from OIE. The evidence shows he paid loan payments to himself at a time he was not making payments on the loan to RODA in the time leading up to filing. The breach and conflict

of duty is exemplified by the decision to collect league dues on behalf of OIE while the Ice Arena is listed and the lack of resolution of the status of the OIE lease, which terminated pursuant to Oregon law prior to the filing. In addition, the relationship between MacMillian's other operational entities, of which he testified about at his 341(a) meeting, and OIE, is less than clear. It is entirely possible for cash to be coming out of the tenant entities to MacMillian.

**B. Cause Exists for Appointment of a trustee Under 1104(a)(2).**

13. Even if the Court is not convinced that MacMillian's actions, or lack of action, rise to the level of incompetence or gross mismanagement sufficient to appoint a Chapter 11 trustee, appointment of a trustee is in the interest of creditors.

14. Dishonesty, incompetence, or gross mismanagement of debtor or debtor-in-possession are not exclusively cause for appointment of trustee in Chapter 11 case. [U]nlike under subsection (a)(1), it is not necessary to find fault on the part of the debtor' to appoint a Chapter 11 trustee pursuant to subsection (a)(2)." *In re Minesen Co*, 2022 WL 5223909 at *15 (D. Hawaii 2022) citing *In re China Fishery Grp. Ltd.*, 2016 WL 6875903, at *14 (quoting *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010)) ( internal citations omitted).

15. In evaluating whether to appoint a Chapter 11 trustee under 11 USC § 1104 (a)(2) the Court considers a number of factors including:

> "…(i)the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors in present management; and (iv) the benefits derived from the appointment of a trustee, balanced against the cost of the appointment."

*Minesen* at 15 citing *Eurospark at 627.*

16. PacWest has very little trust in MacMillian based on the historic interactions and lack of progress. For years PacWest has been told either a refinance or a sale was right around the corner. Yet nothing ever comes to pass and the repeated theme in terms of issues is the uncertainty of the relationship with the operating entity and the status of the lease. Now added to the list is apparently dues collected for leagues that creates obligations to a multitude of third

MOTION TO APPOINT CHAPTER 11 TRUSTEE                                    Page 7 of 9

parties tied to use of the facility. Due to the conflict of interest, PacWest lacks confidence in MacMillian's ability to manage the bankruptcy estates in a way that maximizes assets available to creditors. While it is true that there will be cost, and that may be largely born by PacWest, it believes the benefit derived from a third-party professional who can make decisions in regard to the leases, past due A/R, and remove uncertainty about MacMillian's involvement, outweigh the cost and ultimately may lead to an increase in the value of the Ice Arena.

17. Any appraisal, including an income-based approach, is directly affected by the status of the leases and the confidence in the tenants to provide a stream of revenue. The issues with MacMillian's involvement also create issues in regard to any potential buyer who would want to control the Ice Arena without being subject to MacMillian's involvement. Hilco's report evidences the problems with selling the real property as a result of the uncertainty in regard to the operating entity.

18. PacWest has been in discussion with Mark Calvert about serving as a Chapter 11 trustee. He has indicated his willingness to serve. Upon the court's approval of appointment of a Chapter 11 trustee, an application for his employment will be submitted.

## CONCLUSION

The Debtors are now asking for their fourth extension to file a plan of reorganization and for an extension of the exclusivity period. The sale and bid procedure deadlines have long since run without the Debtors obtaining any offers that have been submitted to PacWest for review. It is almost two years since the loan matured and even longer since the events of default occurred. PacWest is similarly situated to when it was about to carry out the foreclosure sales, that is RODA and MacMillian have failed to move forward with selling or otherwise refinancing the Ice Arena. MacMillian is in breach of his fiduciary duties to creditors and is hindering the ability of RODA to reorganize. The appointment of a trustee is in the best interest of creditors. MacMillian should no longer continue to be in control and allowed to serve his own interests.

///

MOTION TO APPOINT CHAPTER 11 TRUSTEE                          Page 8 of 9

Pursuant to Bankruptcy Rule 2009 (a) PacWest requests appointment of a single Chapter 11 trustee for the jointly administered cases.

DATED: November 30, 2023.

WATKINSON LAIRD RUBENSTEIN, P.C.


By: s/ Julia I. Manela
    Julia I. Manela, OSB No. 023771
    541-484-2277
    Of Attorneys for Creditor PacWest Funding Inc.,
    dba Precision Capital, agent for PC0120N Joint Venture

JULIA I. MANELA, OSB#023771
Email: jmanela@wlrlaw.com
WATKINSON LAIRD RUBENSTEIN, P.C.
Attorneys at Law
1203 Willamette Street, Suite 200
PO Box 10567
Eugene, OR 97440
Telephone: 541-484-2277

Of Attorneys for Creditor PacWest Funding Inc.,
dba Precision Capital, agent for PC0120N Joint Venture

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| In re | Case No. 23-30250-thp11 (Lead Case) |
| RODA, LLC | 23-30159-thp11 |
| And | |
| Roy MacMillan | **DECLARATION OF LORENA TEER IN SUPPORT OF MOTION TO APPOINT CHAPTER 11 TRUSTEE** |
| Debtors-in-Possession. | |

I, Lorena Teer, in accordance with the provisions of 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct:

1.     I am an a Loss Mitigation Specialist for Creditor PacWest Funding Inc., dba Precision Capital, and I make this declaration in support of its Motion to Appoint Chapter 11 Trustee.

2.     A true and complete copy of the guaranty that secures the promissory note for the property described as 17815 & 17715 NE Courtney Rd, Newberg OR 97132, is attached as **Exhibit Teer-1**, which is incorporated by reference as though fully set forth.

DECLARATION OF LORENA TEER

3.     A true and complete copy of the guaranty that secures the promissory note for the real property commonly referred to as 20407 SW Borchers Dr, Sherwood, OR 97140, is attached as **Exhibit Teer-2**, which is incorporated by reference as though fully set forth.

4.     Both loans were made with the understanding that they were to be short-term financing which would be replaced by longer term financing.

5.     After months of discussions, on December 8, 2021, a Notice of Default was sent to the Debtor.

6.     In response, the then attorney responded requesting an extension and indicated that the operations were impacted by the pandemic.

7.     On October 15, 2019, the Debtors provided to PacWest a copy of the Agreement for Loan Related Services to assist the members of RODA, LLC in obtaining new financing which was provided to PacWest. A true and complete copy of the Agreement for Loan Related Services is attached as **Exhibit Teer-3**, which is incorporated by reference as though fully set forth.

**I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on the 29th day of November 2023.**

Lorena Teer
Loss Mitigation Specialist for
Creditor PacWest Funding Inc.,
dba Precision Capital

DECLARATION OF LORENA TEER

<u>**GUARANTY**</u>

THIS GUARANTY ("Guaranty") is entered into and effective as of December 27, 2019 and is among Roy K. MacMillan and David N. Flora (collectively, "Guarantor"); and PacWest Funding Inc dba Precision Capital, whose address for purposes of this Guaranty is PacWest Funding Inc dba Precision Capital, 4710 Village Plaza Loop Suite 100, Eugene, OR 97401 ("Lender"), and is delivered to and in favor of Lender, its successors and assigns.

**RECITALS**

A.    Roy K. MacMillan ("Borrower(s)") has executed or will execute and has delivered or will deliver to Lender a Secured Note dated December 27, 2019 in the original principal amount of ONE MILLION THREE HUNDRED SIXTY-FIVE THOUSAND AND 00/100 ($1,365,000) (the "Note").  The Note is secured by the Security Instrument, and may be secured by other collateral as described in the Note. The Note, Security Instrument and all documents signed in connection with the loan are collectively referred to herein as the "Loan Documents" which evidence the "Loan."

B.    To induce Lender to make the Loan to Borrower, which Guarantor acknowledges that Lender would not make the Loan without a guaranty, Guarantor is delivering to Lender this Guaranty.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing and for other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor agrees as follows:
1.      <u>**Guaranty.**</u>
        1.1.    <u>**Guaranty of Obligations.**</u> Guarantor guarantees to Lender, its successors, and assigns the full and faithful payment of all amounts owed and performance of each and every one of the obligations, responsibilities, and undertakings to be carried out, performed, or observed by Borrower under the Note, the Security Agreement, any other agreement that now or later secures repayment of the Note, any other agreement that Guarantor now or later states is guaranteed, and any other agreement that Guarantor or Borrower signs in connection with the loan obtained by Borrower. All these documents are collectively referred to as the "Loan Documents." The obligations guaranteed are referred to as the "Guaranteed Obligations."
        1.2.    <u>**Guaranty of Borrower's Performance.**</u> If at any time Borrower, its successors or permitted assigns fails, neglects or refuses to pay when due amounts or perform when due any of its obligations, responsibilities, or undertakings as expressly provided under the terms and conditions of the Loan Documents, Guarantor shall pay such amounts or perform or cause to be performed such obligations, responsibilities, or undertakings as required under the terms and conditions of the Loan Documents.
2.      <u>**Absolute.**</u>  This Guaranty is irrevocable, absolute, present, and unconditional. The obligations of Guarantor under this Guaranty shall not be affected, reduced, modified, or impaired on the happening from time to time of any of the following events, whether or not with notice to (except as notice is otherwise expressly required) or the consent of Guarantor:
        2.1.    <u>**Failure to Give Notice.**</u> The failure to give notice to Guarantor of the occurrence of a default under the terms and provisions of this Guaranty or the Loan Documents;
        2.2.    <u>**Modifications or Amendments.**</u> The modification or amendment, whether material or otherwise, of any obligation, covenant, or agreement set forth in this Guaranty or Loan Documents;

---

1

     **2.3.**   **Lender's Failure to Exercise Rights.** Any failure, omission, delay by, or inability by Lender to assert or exercise any right, power, or remedy conferred on Lender in this Guaranty or the Loan Documents, including the failure to execute on collateral held for this Guaranty or the Loan Documents;

     **2.4.**   **Release of Security.** Any release of any real or personal property or other security now held or to be held by Lender for the performance of the Guaranteed Obligations;

     **2.5.**   **Borrower's Termination.** A termination, dissolution, consolidation, or merger of Borrower with or into any other entity;

     **2.6.**   **Borrower's Bankruptcy.** The voluntary or involuntary liquidation, dissolution, sale, or other disposition of all or substantially all of Borrower's assets, the marshalling of Borrower's assets and liabilities, the receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors, or readjustment of, or other similar proceedings affecting Borrower, Guarantor or any of the assets of either Borrower or Guarantor;

     **2.7.**   **Borrower's Assignment of Rights.** The assignment of any right, title, or interest of Lender in this Guaranty or the Loan Documents to any other person; or

     **2.8.**   **Extent of Guarantor's Obligations.** Any other cause or circumstance, foreseen or unforeseen, whether similar or dissimilar to any of the foregoing; it being the intent of Guarantor that its obligations under this Guaranty shall not be discharged, reduced, limited, or modified except by (a) payment of amounts owing pursuant to this Guaranty and/or Loan Documents (and then only to the extent of such payment or payments); and (b) full performance of obligations under this Guaranty and/or Loan Documents (and then only to the extent of such performed or discharged obligation or obligations).

     **2.9.**   **Exercise of Lender Rights.** Any action of Lender authorized pursuant to Section 6 below.

**3.**   **Additional Credit.** Additional credit under the Loan Documents may be granted from time to time at Borrower's request and without further authorization from or notice to Guarantor and shall automatically be deemed part of the Guaranteed Obligations. Lender need not inquire into Borrower's power or the authority of its members, officers, or agents acting or purporting to act on its behalf. Each credit granted to Borrower under the Loan Documents shall be deemed to have been granted at Guarantor's instance and request and in consideration of, and in reliance on, this Guaranty.

**4.**   **Guaranty of Payment.** Guarantor's liability on this Guaranty is a guaranty of payment and performance, not of collectability.

**5.**   **Cessation of Liability.** Guarantor's liability under this Guaranty shall not in any way be affected by the cessation of Borrower's liability for any reason other than full performance of all the obligations under the Loan Documents, including, without limitation, any and all obligations to indemnify Lender.

**6.**   **Authorization of Lender.** Guarantor authorizes Lender, without notice or demand and without affecting its liability under this Guaranty, and without consent of Guarantor or prior notice to Guarantor, to:

     **6.1.**   **Modify Loan Documents.** Make any modifications to the Loan Documents;

     **6.2.**   **Assign Guaranty.** Assign the Loan Documents and this Guaranty;

     **6.3.**   **Modify Security.** Take, hold, or release security for the performance of the Guaranteed Obligations with the consent of the party providing such security;

     **6.4.**   **Additional Guarantors.** Accept or discharge, in whole or in part, additional guarantors;

     **6.5.**   **Order of Sale.** Direct the order and manner of any sale of all or any part of security now or later held under the Loan Documents or this Guaranty, and also bid at any such sale to the extent allowed by law; and

     **6.6.**   **Application of Proceeds.** Apply any payments or recovery from Borrower, Guarantor, or any source, and any proceeds of any security, to Borrower's obligations under the Loan Documents in such manner, order, and priority as Lender may elect, whether or not those obligations are guaranteed by this Guaranty or secured at the time of such application.

**7.**   **Lender's Rights on Borrower's Default.** Guarantor agrees that on Borrower's default Lender may elect to nonjudicially or judicially foreclose against all or part of the real or personal property securing

2

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC1219U

Rev. 05/11

Borrower's obligations, or accept an assignment of any such security in lieu of foreclosure, or compromise or adjust any part of such obligations, or make any other accommodation with Borrower or Guarantor, or exercise any other remedy against Borrower or any security.  No such action by Lender shall release or limit Guarantor's liability to Lender, even if the effect of that action is to deprive Guarantor of the right to collect reimbursement from Borrower or any other person for any sums paid to Lender or bar or prejudice Guarantor's rights of subrogation, contribution, or indemnity against Borrower or any other person. Without limiting the foregoing, it is understood and agreed that, on any foreclosure or assignment in lieu of foreclosure of any security held by Lender, such security shall no longer exist and that any right that Guarantor might otherwise have, on full payment of the Borrower's obligations by Guarantor to Lender, to participate in any such security or to be subrogated to any rights of Lender with respect to any such security shall be nonexistent; nor shall Guarantor be deemed to have any right, title, interest, or claim under any circumstances in or to any real or personal property held by Lender or any third party following any foreclosure or assignment in lieu of foreclosure of any such security.  Guarantor again specifically acknowledges and waives the above as more specifically provided for in Section 24.2.3.

**8.      Effect of Borrower's Bankruptcy.**  The liability of Guarantor under this Guaranty shall in no way be affected by:

> **8.1.      Release of Borrower.**  Release or discharge of Borrower in any creditor proceeding, receivership, bankruptcy, or other release or discharge of Borrower, for any reason;

> **8.2.      Modification of Borrower's Liability.**  Impairment, limitation, or modification of Borrower's liability or the estate, or of any remedy for the enforcement of Borrower's liability, which may result from the operation of any present or future provision of the Bankruptcy Code (Title 11 of the United States Code, as amended; 11 U.S.C. §§ 101-1330) or any bankruptcy, insolvency, state or federal debtor relief statute, any other statute, or from the decision of any court;

> **8.3.      Rejection of Debt.**  Rejection or disaffirmance of the Indebtedness, or any portion of the Indebtedness, in any such proceeding; or

> **8.4.      Cessation of Borrower's Liability.**  Cessation, from any cause whatsoever, whether consensual or by operation of law, of Borrower's liability to Lender resulting from any such proceeding.

> **8.5      Modification and Replacement of Guaranteed Obligation**.  If the Guaranteed Obligations are restructured or replaced in connection with a bankruptcy proceeding or case, Guarantor shall remain liable as guarantor of such restructured or replaced obligation.

**9.      Subordination.**  Until the Guaranteed Obligations have been paid or otherwise discharged in full, Guarantor subordinates any and all liability or indebtedness of Borrower owed to Guarantor to the obligations of Borrower to Lender that arise under the Guaranteed Obligations.  However, Guarantor may receive payment of current reasonable salary and current reasonable payments made in the ordinary course of business for goods provided or services rendered.

**10.      Application of Payments.**  With or without notice to Guarantor, Lender, in its sole and absolute discretion may:

> **10.1.      Priority of Payments.**  Apply any or all payments or recoveries from Borrower, from Guarantor, or from any other guarantor or endorser under this or any other instrument, or realized from any security, in such manner, order, or priority as Lender sees fit, to the indebtedness of Borrower to Lender under the Loan Documents, whether such indebtedness is guaranteed by this Guaranty or is otherwise secured or is due at the time of such application; and

> **10.2.      Refund to Borrower.**  Refund to Borrower any payment received by Lender on any indebtedness guaranteed in this Guaranty, and payment of the amount refunded is fully guaranteed.  Any recovery realized from any other guarantor under this or any other instrument shall be first credited on that portion of the indebtedness of Borrower to Lender that exceeds the maximum liability, if any, of Guarantor under this Guaranty.

**11.      Claims in Bankruptcy.**  Guarantor shall file all claims against Borrower in any bankruptcy or other proceeding in which the filing of claims is required or allowed by law on any indebtedness of

---

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC1219U

Rev. 05/11

Borrower to Guarantor, and shall assign to Lender all rights of Guarantor on any such indebtedness. If Guarantor does not file any such claim, Lender, as attorney-in-fact for Guarantor, is authorized to do so in Guarantor's name, or, in Lender's discretion, to assign the claim and to file a proof of claim in the name of Lender's nominee. In all such cases, whether in bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Lender the full amount of any such claim, and, to the full extent necessary for that purpose, Guarantor assigns to Lender all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled.

12.     **Representations and Warranties if Guarantor is an Entity.**  If Guarantor is an entity, Guarantor represents and warrants to Lender that:

   12.1.    **Legal Status.**  Guarantor (a) is duly organized, validly existing under, and in good standing with, the laws of the state in which it is domiciled and in the state in which the property secured the Loan is located in; (b) has all requisite power, and has all material governmental licenses, authorizations, consents, and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted; and (c) is qualified to do business in the state in which any property securing the loan is located in.

   12.2.    **No Breach.**  Neither the execution and delivery of this Guaranty nor compliance with its terms and provisions shall conflict with or result in a breach of, or require any consent under, the organizational documents of Guarantor, or any agreement or instrument by which Guarantor is bound.

   12.3.    **Authority and Power.**  Guarantor has all necessary power and authority to execute, deliver, and perform its obligations under this Guaranty. Guarantor's execution, delivery, and performance of this Guaranty has been duly authorized by all necessary action on its part; and this Guaranty has been duly and validly executed and delivered by Guarantor and constitutes its legal, valid, and binding obligation, enforceable against Guarantor in accordance with its terms. Guarantor shall, concurrently with the execution of this Guaranty, deliver to Lender a copy of a resolution of Guarantor's managing member(s), if a limited liability company, or board of directors and/or shareholders, if a corporation, authorizing or ratifying execution of this Guaranty.

13.     **Representations and Warranties if Guarantor is an Individual.**  If Guarantor is an individual, Guarantor represents and warrants to Lender that:

   13.1.    **Legal Status.**  Guarantor has all requisite power and has all material governmental licenses, authorizations, consents, and approvals necessary to carry on his business as now being or as proposed to be conducted.

   13.2.    **No Breach.**  Neither the execution and delivery of this Guaranty nor compliance with its terms and provisions shall conflict with or result in a breach of, or require any consent under any agreement or instrument by which Guarantor is bound.

   13.3.    **Authority and Power.**  This Guaranty has been duly and validly executed and delivered by Guarantor and constitutes its legal, valid, and binding obligation, enforceable against Guarantor in accordance with its terms.

   13.4.    **Financial Statements.**  All financial information furnished or to be furnished to lender is or will be true and correct, does or will fairly represent the financial condition of Guarantor, and was or will be prepared in accordance with generally accepted accounting principles ("GAAP").

   13.5.    **Claims and Proceedings.**  There are no claims, actions, proceedings, or investigations pending against Guarantor.

14.     **Information Not Required.**  Guarantor represents that Guarantor is fully aware of Borrower's financial condition and operation and is in a position by virtue of his, her, or its relationship to Borrower to obtain all necessary financial and operational information concerning Borrower.  Lender need not disclose to Guarantor any information about:

   14.1.    **Loan Documents.**  The Loan Documents or any modification of them, and any action or non-action in connection with them;

   14.2.    **Other Guaranteed Obligations.**  Any other obligation guaranteed in this Guaranty;

---

4

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC1219U

Rev. 05/11

**14.3.** **Borrower's Financial Condition.** The financial condition or operation of Borrower; or

**14.4.** **Other Guarantors.** Any other guarantors.

**15.** **Notice.** Except for any notice required by Governmental Requirements to be given in another manner, (a) all notices required or permitted by this Guaranty shall be in writing; (b) each notice to Guarantor shall be sent (i) for personal delivery by a delivery service that provides a record of the date of delivery, the individual to whom delivery was made, and the address where delivery was made; (ii) by certified United States mail, postage prepaid, return receipt requested; or (iii) by nationally recognized overnight delivery service, marked for next-business-day delivery; and (c) all notices shall be addressed to the appropriate party at its address stated on Page 1 of this Guaranty or such other addresses as may be designated by notice given in compliance with this provision. Notices will be deemed effective on the earliest of (a) actual receipt; (b) rejection of delivery; or (c) if sent by certified mail, the third day on which regular United States mail delivery service is provided after the day of mailing or, if sent by overnight delivery service, on the next day on which such service makes next-business-day deliveries after the day of sending.

**16.** **No Waiver Upon Lender's Lack of Enforcement.** No failure or delay by Lender, or its successors and assigns, in exercising any right, power, or privilege under this Guaranty shall operate as a waiver; nor shall any single or partial exercise of any right, power, or privilege preclude any other or further such exercise or the exercise of any other right, power, or privilege.

**17.** **Governing Law.** This Guaranty shall be governed by and construed in accordance with the internal laws of the State of Oregon. The Parties agree that jurisdiction and venue for any dispute, claim or controversy arising, other than with respect to perfection and enforcement of Lender's rights against the Property, shall be the County in which notice shall be sent to Lender pursuant this Guaranty, or the applicable federal district court that covers said County, and Guarantor submits to personal jurisdiction in that forum for any and all purposes. Guarantor waives any right Guarantor may have to assert the doctrine of forum non conveniens or to object to such venue.

BORROWER'S INITIALS: _____ _____

**18.** **Advice of Counsel.** Guarantor expressly declares that it knows and understands the contents of this Guaranty and has either consulted or had the opportunity to consult with an attorney as to its form and content.

**19.** **Attorney Fees.** Whether or not legal action is commenced, dismissed, or pursued to judgment, the prevailing party shall be entitled to payment of all fees and costs (including, without limitation, attorney fees and costs) that may be incurred by such party in connection with the enforcement of this Guaranty, the enforcement of any of the Loan Documents, and the protection of prevailing party's rights under this Guaranty or under the Loan Documents (whether in state, federal, or Bankruptcy Court proceedings).

In addition to the aforementioned fees, costs, and expenses, the prevailing party in any lawsuit on this Guaranty shall be entitled to its attorney fees, and all other fees, costs, and expenses incurred in any post-judgment proceedings to collect or enforce any judgment. This provision for the recovery of post-judgment fees, costs, and expenses is separate and several and shall survive the merger of this Guaranty into any judgment on this Guaranty.

**20.** **Assignability.** This Guaranty shall be binding on Guarantor and Guarantor's heirs, representatives, successors and assigns and shall inure to the benefit of Lender, its successors and assigns, and their successors and assigns and respective personal representatives, successors, and assigns according to the context of this Guaranty. Guarantor shall not have the right to assign the obligations in this Guaranty. Lender may assign its rights under this Guaranty in connection with an assignment of all or part of the Guaranteed Obligation. Notice is hereby waived as to any such assignment by Lender.

**21.** **Revival of Guaranty.** If a claim ("Claim") is made on Lender at any time (whether before or after payment or performance in full of any Guaranteed Obligation, and whether such claim is asserted in a

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC1219U

Rev. 05/11

bankruptcy proceeding or otherwise) for repayment or recovery of any amount or other value received by Lender (from any source) in payment of, or on account of, any Guaranteed Obligation, and if Lender repays such amount, returns value or otherwise becomes liable for all or part of such Claim by reason of (a) any judgment, decree, or order of any court or administrative body or (b) any settlement or compromise of such Claim, Guarantor shall remain severally liable to Lender for the amount so repaid or returned or for which Lender is liable to the same extent as if such payments or value had never been received by Lender, despite any termination of this Guaranty or the cancellation of any note or other document evidencing any Guaranteed Obligation.

**22.**     **Captions.** The captions and section headings appearing in this Guaranty are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Guaranty.

**23.**     **Severability.** If any provision in this Guaranty is invalid and unenforceable in the jurisdiction whose law is applied to this Guaranty or in any particular context, then, to the fullest extent permitted by law, (a) the other provisions shall remain in full force and effect in such jurisdiction or context and shall be liberally construed in favor of Lender in order to carry out the parties' intentions as nearly as possible, and (b) the invalidity or unenforceability of any provision in that jurisdiction or context shall not affect the validity or enforceability of such provision in any other jurisdiction.

**24.**     **Waivers.**

    **24.1.**     **Waiver of Rights to Require Lender to Act.** Guarantor waives the right to require Lender to:

        24.1.1. Proceed against Borrower or any other person;

        24.1.2. Proceed or exhaust any security held from any person;

        24.1.3. Proceed against any other guarantor; or

        24.1.4. Pursue any other remedy available to Lender.

    **24.2.**     **Waivers Until Obligation Is Repaid.** Until the Guaranteed Obligations have been paid or otherwise discharged in full:

        24.2.1. Guarantor waives all rights of subrogation, indemnity, any rights to collect reimbursement from Borrower, and any right to enforce any remedy that Lender now has, or may have, against Borrower.

        24.2.2. Guarantor waives any benefit of, and any right to participate in, any security now or later held by Lender.

        24.2.3. Guarantor waives any defense it may have now or in the future based on any election of remedies by Lender that destroys Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, and Guarantor acknowledges that it shall be liable to Lender even though Guarantor may well have no such recourse against Borrower.

        24.2.4. Guarantor waives notice of (a) acceptance and reliance on this Guaranty; (b) notice of renewal, extension, or modification of any Guaranteed Obligation under this Guaranty; and (c) notice of default or demand in the case of default.

        24.2.5. Guarantor waives any right or defense it may now or hereafter have based on (a) Lender's full or partial release of any party who may be obligated to Lender; (b) Lender's full or partial release or impairment of any collateral for the Guaranteed Obligations; and (c) the modification or extension of the Guaranteed Obligations.

        24.2.6. Guarantor waives any and all suretyship defenses now or later available to it under Oregon law.

        24.2.7. Reserved.

        24.2.8. Guarantor waives any statute of limitation affecting liability under this Guaranty or the enforceability of this Guaranty and further waives any defense that might otherwise exist because of the expiration of the statute of limitations on the Loan Documents.

        24.2.9. Guarantor waives any duty of Lender to disclose to Guarantor any facts Lender may now know or later learn about Borrower or Borrower's financial condition regardless of whether Lender

---

6

has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume, or has reason to believe that such facts are unknown to Guarantor, or has a reasonable opportunity to communicate such facts to Guarantor, it being understood and agreed that Guarantor is fully responsible for and is capable of being and keeping informed of Borrower's financial condition and of all circumstances bearing on the risk of nonpayment of any indebtedness guaranteed under this Guaranty.

24.2.10. Guarantor waives all notices to Guarantor.

**25.** **Arbitration.** Concurrently herewith, Borrower and Guarantor shall execute that certain Arbitration Agreement whereby Borrower, Guarantor, and Lender agree to arbitrate any disputes to resolve any Claims (as defined in the Arbitration Agreement).

**26.** **Jurisdiction**. The parties agree that all actions or proceedings arising in connection with this Guaranty and the other Loan Documents shall be tried and litigated only in the state courts located in the county in which notice shall be sent to Lender pursuant to this Guaranty, or the applicable federal district court that covers said county.

**27.** **Joint and Several.** If this Guaranty is issued by more than one party or if any other party guarantees the obligations of Borrower, the obligations of Guarantor and any others under this Guaranty shall be joint and several.

**28.** **Entire Agreement.** This Guaranty embodies the entire agreement and understanding between Guarantor and Lender pertaining to the subject matter of this Guaranty, and supersedes all prior agreements, understandings, negotiations, representations, and discussions, whether verbal or written, of the parties, pertaining to that subject matter. Guarantor is not relying on any representations, warranties, or inducements from Lender that are not expressly stated in this Guaranty.

**29.** **Further Assurances.** Guarantor shall promptly and duly execute and deliver to Lender such further documents and assurances and take such further action as Lender may from time to time reasonably request, including, without limitation, any amendments to this Guaranty to establish and protect the rights, interests, and remedies created or intended to be created in favor of Lender.

**30.** **Gender; Singular Includes Plural.** As used in this Guaranty, the singular includes the plural, and the masculine includes the feminine and neuter, and vice versa, if the context so requires.

**31.** **Nonwaiver.** No provision of this Guaranty or right of Lender under this Guaranty can be waived, nor can Guarantor be released from its obligations under this Guaranty except by a writing duly executed by an authorized representative of Lender.

**32.** **Continuing Liability.** Guarantor shall continue to be liable under this Guaranty despite the transfer by Borrower of all or any portion of the property encumbered by the Loan Documents.

**33.** **Time Is of the Essence.** Time is of the essence under this Guaranty and any amendment, modification, or revision of this Guaranty.

**34.** **Cumulative Rights.** The extent of Guarantor's liability and all rights, powers, and remedies of Lender under this Guaranty, and under any other agreement now or at any future time in force between Lender and Guarantor, shall be cumulative and not alternative, and such rights, powers, and remedies shall be in addition to all rights, powers, and remedies given to Lender by law. This Guaranty is in addition to and exclusive of the guaranty of any other guarantor of any indebtedness of Borrower to Lender.

**35.** **WAIVER OF JURY TRIAL.** LENDER AND GUARANTOR WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION OR PROCEEDING WITH RESPECT TO, IN CONNECTION WITH, OR ARISING FROM THIS GUARANTY OR THE LOAN DOCUMENTS, OR ANY INSTRUMENT OR DOCUMENT DELIVERED IN CONNECTION WITH THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HERE, OR THE GUARANTY'S VALIDITY, PROTECTION, INTERPRETATION, COLLECTION, OR ENFORCEMENT, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING (INCLUDING TORT AND CLAIMS FOR BREACH OF DUTY) BETWEEN LENDER AND GUARANTOR.

**36.** **Capitalized Terms.** Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Security Instrument executed of even date herewith.

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC1219U

Rev. 05/11

37.  **NO ORAL AGREEMENTS.** UNDER OREGON LAW, MOST AGREEMENTS, PROMISES, AND COMMITMENTS MADE BY LENDER CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY BORROWER'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION, AND BE SIGNED BY LENDER TO BE ENFORCEABLE

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty as of the date first written above.

**GUARANTOR:**

**Roy K MacMillan**
**David N. Flora**
**RODA, LLC**
**Oregon Ice Entertainment, Inc**

_____
Roy K MacMillan

_____
David N. Flora

_____
Roy MacMillan, Managing Member
RODA, LLC

_____
Roy MacMillan, President
Oregon Ice Entertainment, Inc

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC1219U

Rev. 05/11

# GUARANTY

THIS GUARANTY ("Guaranty") is entered into and effective as of January 21, 2020 and is among Roy K MacMillan and David N. Flora (collectively, "Guarantor"); and PacWest Funding Inc dba Precision Capital, whose address for purposes of this Guaranty is PacWest Funding Inc dba Precision Capital, 4710 Village Plaza Loop Suite 100, Eugene, OR 97401 ("Lender"), and is delivered to and in favor of Lender, its successors and assigns.

## RECITALS

A.     RODA, LLC ("Borrower(s)") has executed or will execute and has delivered or will deliver to Lender a Secured Note dated January 21, 2020 in the original principal amount of FIVE MILLION SIX HUNDRED EIGHTY-TWO THOUSAND AND 00/100 ($5,682,000) (the "Note"). The Note is secured by the Security Instrument, and may be secured by other collateral as described in the Note. The Note, Security Instrument and all documents signed in connection with the loan are collectively referred to herein as the "Loan Documents" which evidence the "Loan."

B.     To induce Lender to make the Loan to Borrower, which Guarantor acknowledges that Lender would not make the Loan without a guaranty, Guarantor is delivering to Lender this Guaranty.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and for other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor agrees as follows:

1.     **Guaranty.**
    1.1.     **Guaranty of Obligations.** Guarantor guarantees to Lender, its successors, and assigns the full and faithful payment of all amounts owed and performance of each and every one of the obligations, responsibilities, and undertakings to be carried out, performed, or observed by Borrower under the Note, the Security Agreement, any other agreement that now or later secures repayment of the Note, any other agreement that Guarantor now or later states is guaranteed, and any other agreement that Guarantor or Borrower signs in connection with the loan obtained by Borrower. All these documents are collectively referred to as the "Loan Documents." The obligations guaranteed are referred to as the "Guaranteed Obligations."
    1.2.     **Guaranty of Borrower's Performance.** If at any time Borrower, its successors or permitted assigns fails, neglects or refuses to pay when due amounts or perform when due any of its obligations, responsibilities, or undertakings as expressly provided under the terms and conditions of the Loan Documents, Guarantor shall pay such amounts or perform or cause to be performed such obligations, responsibilities, or undertakings as required under the terms and conditions of the Loan Documents.

2.     **Absolute.** This Guaranty is irrevocable, absolute, present, and unconditional. The obligations of Guarantor under this Guaranty shall not be affected, reduced, modified, or impaired on the happening from time to time of any of the following events, whether or not with notice to (except as notice is otherwise expressly required) or the consent of Guarantor:
    2.1.     **Failure to Give Notice.** The failure to give notice to Guarantor of the occurrence of a default under the terms and provisions of this Guaranty or the Loan Documents;
    2.2.     **Modifications or Amendments.** The modification or amendment, whether material or otherwise, of any obligation, covenant, or agreement set forth in this Guaranty or Loan Documents;

---

1

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC0120N

Rev. 05/11

Exhibit Teer-2, Page 1 of 8

**2.3.** **Lender's Failure to Exercise Rights.** Any failure, omission, delay by, or inability by Lender to assert or exercise any right, power, or remedy conferred on Lender in this Guaranty or the Loan Documents, including the failure to execute on collateral held for this Guaranty or the Loan Documents;

**2.4.** **Release of Security.** Any release of any real or personal property or other security now held or to be held by Lender for the performance of the Guaranteed Obligations;

**2.5.** **Borrower's Termination.** A termination, dissolution, consolidation, or merger of Borrower with or into any other entity;

**2.6.** **Borrower's Bankruptcy.** The voluntary or involuntary liquidation, dissolution, sale, or other disposition of all or substantially all of Borrower's assets, the marshalling of Borrower's assets and liabilities, the receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors, or readjustment of, or other similar proceedings affecting Borrower, Guarantor or any of the assets of either Borrower or Guarantor;

**2.7.** **Borrower's Assignment of Rights.** The assignment of any right, title, or interest of Lender in this Guaranty or the Loan Documents to any other person; or

**2.8.** **Extent of Guarantor's Obligations.** Any other cause or circumstance, foreseen or unforeseen, whether similar or dissimilar to any of the foregoing; it being the intent of Guarantor that its obligations under this Guaranty shall not be discharged, reduced, limited, or modified except by (a) payment of amounts owing pursuant to this Guaranty and/or Loan Documents (and then only to the extent of such payment or payments); and (b) full performance of obligations under this Guaranty and/or Loan Documents (and then only to the extent of such performed or discharged obligation or obligations).

**2.9.** **Exercise of Lender Rights.** Any action of Lender authorized pursuant to Section 6 below.

**3.** **Additional Credit.** Additional credit under the Loan Documents may be granted from time to time at Borrower's request and without further authorization from or notice to Guarantor and shall automatically be deemed part of the Guaranteed Obligations. Lender need not inquire into Borrower's power or the authority of its members, officers, or agents acting or purporting to act on its behalf. Each credit granted to Borrower under the Loan Documents shall be deemed to have been granted at Guarantor's instance and request and in consideration of, and in reliance on, this Guaranty.

**4.** **Guaranty of Payment.** Guarantor's liability on this Guaranty is a guaranty of payment and performance, not of collectability.

**5.** **Cessation of Liability.** Guarantor's liability under this Guaranty shall not in any way be affected by the cessation of Borrower's liability for any reason other than full performance of all the obligations under the Loan Documents, including, without limitation, any and all obligations to indemnify Lender.

**6.** **Authorization of Lender.** Guarantor authorizes Lender, without notice or demand and without affecting its liability under this Guaranty, and without consent of Guarantor or prior notice to Guarantor, to:

**6.1.** **Modify Loan Documents.** Make any modifications to the Loan Documents;

**6.2.** **Assign Guaranty.** Assign the Loan Documents and this Guaranty;

**6.3.** **Modify Security.** Take, hold, or release security for the performance of the Guaranteed Obligations with the consent of the party providing such security;

**6.4.** **Additional Guarantors.** Accept or discharge, in whole or in part, additional guarantors;

**6.5.** **Order of Sale.** Direct the order and manner of any sale of all or any part of security now or later held under the Loan Documents or this Guaranty, and also bid at any such sale to the extent allowed by law; and

**6.6.** **Application of Proceeds.** Apply any payments or recovery from Borrower, Guarantor, or any source, and any proceeds of any security, to Borrower's obligations under the Loan Documents in such manner, order, and priority as Lender may elect, whether or not those obligations are guaranteed by this Guaranty or secured at the time of such application.

**7.** **Lender's Rights on Borrower's Default.** Guarantor agrees that on Borrower's default Lender may elect to nonjudicially or judicially foreclose against all or part of the real or personal property securing

2

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC0120N

Rev. 05/11

Borrower's obligations, or accept an assignment of any such security in lieu of foreclosure, or compromise or adjust any part of such obligations, or make any other accommodation with Borrower or Guarantor, or exercise any other remedy against Borrower or any security. No such action by Lender shall release or limit Guarantor's liability to Lender, even if the effect of that action is to deprive Guarantor of the right to collect reimbursement from Borrower or any other person for any sums paid to Lender or bar or prejudice Guarantor's rights of subrogation, contribution, or indemnity against Borrower or any other person. Without limiting the foregoing, it is understood and agreed that, on any foreclosure or assignment in lieu of foreclosure of any security held by Lender, such security shall no longer exist and that any right that Guarantor might otherwise have, on full payment of the Borrower's obligations by Guarantor to Lender, to participate in any such security or to be subrogated to any rights of Lender with respect to any such security shall be nonexistent; nor shall Guarantor be deemed to have any right, title, interest, or claim under any circumstances in or to any real or personal property held by Lender or any third party following any foreclosure or assignment in lieu of foreclosure of any such security. Guarantor again specifically acknowledges and waives the above as more specifically provided for in Section 24.2.3.

**8.** **Effect of Borrower's Bankruptcy.** The liability of Guarantor under this Guaranty shall in no way be affected by:

**8.1.** **Release of Borrower.** Release or discharge of Borrower in any creditor proceeding, receivership, bankruptcy, or other release or discharge of Borrower, for any reason;

**8.2.** **Modification of Borrower's Liability.** Impairment, limitation, or modification of Borrower's liability or the estate, or of any remedy for the enforcement of Borrower's liability, which may result from the operation of any present or future provision of the Bankruptcy Code (Title 11 of the United States Code, as amended; 11 U.S.C. §§ 101-1330) or any bankruptcy, insolvency, state or federal debtor relief statute, any other statute, or from the decision of any court;

**8.3.** **Rejection of Debt.** Rejection or disaffirmance of the Indebtedness, or any portion of the Indebtedness, in any such proceeding; or

**8.4.** **Cessation of Borrower's Liability.** Cessation, from any cause whatsoever, whether consensual or by operation of law, of Borrower's liability to Lender resulting from any such proceeding.

**8.5** **Modification and Replacement of Guaranteed Obligation**. If the Guaranteed Obligations are restructured or replaced in connection with a bankruptcy proceeding or case, Guarantor shall remain liable as guarantor of such restructured or replaced obligation.

**9.** **Subordination.** Until the Guaranteed Obligations have been paid or otherwise discharged in full, Guarantor subordinates any and all liability or indebtedness of Borrower owed to Guarantor to the obligations of Borrower to Lender that arise under the Guaranteed Obligations. However, Guarantor may receive payment of current reasonable salary and current reasonable payments made in the ordinary course of business for goods provided or services rendered.

**10.** **Application of Payments.** With or without notice to Guarantor, Lender, in its sole and absolute discretion may:

**10.1.** **Priority of Payments.** Apply any or all payments or recoveries from Borrower, from Guarantor, or from any other guarantor or endorser under this or any other instrument, or realized from any security, in such manner, order, or priority as Lender sees fit, to the indebtedness of Borrower to Lender under the Loan Documents, whether such indebtedness is guaranteed by this Guaranty or is otherwise secured or is due at the time of such application; and

**10.2.** **Refund to Borrower.** Refund to Borrower any payment received by Lender on any indebtedness guaranteed in this Guaranty, and payment of the amount refunded is fully guaranteed. Any recovery realized from any other guarantor under this or any other instrument shall be first credited on that portion of the indebtedness of Borrower to Lender that exceeds the maximum liability, if any, of Guarantor under this Guaranty.

**11.** **Claims in Bankruptcy.** Guarantor shall file all claims against Borrower in any bankruptcy or other proceeding in which the filing of claims is required or allowed by law on any indebtedness of

---

3

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC0120N

Rev. 05/11

Borrower to Guarantor, and shall assign to Lender all rights of Guarantor on any such indebtedness. If Guarantor does not file any such claim, Lender, as attorney-in-fact for Guarantor, is authorized to do so in Guarantor's name, or, in Lender's discretion, to assign the claim and to file a proof of claim in the name of Lender's nominee. In all such cases, whether in bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Lender the full amount of any such claim, and, to the full extent necessary for that purpose, Guarantor assigns to Lender all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled.

**12.**  **Representations and Warranties if Guarantor is an Entity.**  If Guarantor is an entity, Guarantor represents and warrants to Lender that:

    **12.1.**  **Legal Status.**  Guarantor (a) is duly organized, validly existing under, and in good standing with, the laws of the state in which it is domiciled and in the state in which the property secured the Loan is located in; (b) has all requisite power, and has all material governmental licenses, authorizations, consents, and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted; and (c) is qualified to do business in the state in which any property securing the loan is located in.

    **12.2.**  **No Breach.**  Neither the execution and delivery of this Guaranty nor compliance with its terms and provisions shall conflict with or result in a breach of, or require any consent under, the organizational documents of Guarantor, or any agreement or instrument by which Guarantor is bound.

    **12.3.**  **Authority and Power.**  Guarantor has all necessary power and authority to execute, deliver, and perform its obligations under this Guaranty. Guarantor's execution, delivery, and performance of this Guaranty has been duly authorized by all necessary action on its part; and this Guaranty has been duly and validly executed and delivered by Guarantor and constitutes its legal, valid, and binding obligation, enforceable against Guarantor in accordance with its terms. Guarantor shall, concurrently with the execution of this Guaranty, deliver to Lender a copy of a resolution of Guarantor's managing member(s), if a limited liability company, or board of directors and/or shareholders, if a corporation, authorizing or ratifying execution of this Guaranty.

**13.**  **Representations and Warranties if Guarantor is an Individual.**  If Guarantor is an individual, Guarantor represents and warrants to Lender that:

    **13.1**  **Legal Status.**  Guarantor has all requisite power and has all material governmental licenses, authorizations, consents, and approvals necessary to carry on his business as now being or as proposed to be conducted.

    **13.2.**  **No Breach.**  Neither the execution and delivery of this Guaranty nor compliance with its terms and provisions shall conflict with or result in a breach of, or require any consent under any agreement or instrument by which Guarantor is bound.

    **13.3.**  **Authority and Power.**  This Guaranty has been duly and validly executed and delivered by Guarantor and constitutes its legal, valid, and binding obligation, enforceable against Guarantor in accordance with its terms.

    **13.4.**  **Financial Statements.**  All financial information furnished or to be furnished to lender is or will be true and correct, does or will fairly represent the financial condition of Guarantor, and was or will be prepared in accordance with generally accepted accounting principles ("GAAP").

    **13.5.**  **Claims and Proceedings.**  There are no claims, actions, proceedings, or investigations pending against Guarantor.

**14.**  **Information Not Required.**  Guarantor represents that Guarantor is fully aware of Borrower's financial condition and operation and is in a position by virtue of his, her, or its relationship to Borrower to obtain all necessary financial and operational information concerning Borrower. Lender need not disclose to Guarantor any information about:

    **14.1.**  **Loan Documents.**  The Loan Documents or any modification of them, and any action or non-action in connection with them;

    **14.2.**  **Other Guaranteed Obligations.**  Any other obligation guaranteed in this Guaranty;

---

4

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC0120N

Rev. 05/11

**14.3.** **Borrower's Financial Condition.** The financial condition or operation of Borrower; or
**14.4.** **Other Guarantors.** Any other guarantors.

**15.** **Notice.** Except for any notice required by Governmental Requirements to be given in another manner, (a) all notices required or permitted by this Guaranty shall be in writing; (b) each notice to Guarantor shall be sent (i) for personal delivery by a delivery service that provides a record of the date of delivery, the individual to whom delivery was made, and the address where delivery was made; (ii) by certified United States mail, postage prepaid, return receipt requested; or (iii) by nationally recognized overnight delivery service, marked for next-business-day delivery; and (c) all notices shall be addressed to the appropriate party at its address stated on Page 1 of this Guaranty or such other addresses as may be designated by notice given in compliance with this provision. Notices will be deemed effective on the earliest of (a) actual receipt; (b) rejection of delivery; or (c) if sent by certified mail, the third day on which regular United States mail delivery service is provided after the day of mailing or, if sent by overnight delivery service, on the next day on which such service makes next-business-day deliveries after the day of sending.

**16.** **No Waiver Upon Lender's Lack of Enforcement.** No failure or delay by Lender, or its successors and assigns, in exercising any right, power, or privilege under this Guaranty shall operate as a waiver; nor shall any single or partial exercise of any right, power, or privilege preclude any other or further such exercise or the exercise of any other right, power, or privilege.

**17.** **Governing Law.** This Guaranty shall be governed by and construed in accordance with the internal laws of the State of Oregon. The Parties agree that jurisdiction and venue for any dispute, claim or controversy arising, other than with respect to perfection and enforcement of Lender's rights against the Property, shall be the County in which notice shall be sent to Lender pursuant this Guaranty, or the applicable federal district court that covers said County, and Guarantor submits to personal jurisdiction in that forum for any and all purposes. Guarantor waives any right Guarantor may have to assert the doctrine of forum non conveniens or to object to such venue.

BORROWER'S INITIALS:

**18.** **Advice of Counsel.** Guarantor expressly declares that it knows and understands the contents of this Guaranty and has either consulted or had the opportunity to consult with an attorney as to its form and content.

**19.** **Attorney Fees.** Whether or not legal action is commenced, dismissed, or pursued to judgment, the prevailing party shall be entitled to payment of all fees and costs (including, without limitation, attorney fees and costs) that may be incurred by such party in connection with the enforcement of this Guaranty, the enforcement of any of the Loan Documents, and the protection of prevailing party's rights under this Guaranty or under the Loan Documents (whether in state, federal, or Bankruptcy Court proceedings).

In addition to the aforementioned fees, costs, and expenses, the prevailing party in any lawsuit on this Guaranty shall be entitled to its attorney fees, and all other fees, costs, and expenses incurred in any post-judgment proceedings to collect or enforce any judgment. This provision for the recovery of post-judgment fees, costs, and expenses is separate and several and shall survive the merger of this Guaranty into any judgment on this Guaranty.

**20.** **Assignability.** This Guaranty shall be binding on Guarantor and Guarantor's heirs, representatives, successors and assigns and shall inure to the benefit of Lender, its successors and assigns, and their successors and assigns and respective personal representatives, successors, and assigns according to the context of this Guaranty. Guarantor shall not have the right to assign the obligations in this Guaranty. Lender may assign its rights under this Guaranty in connection with an assignment of all or part of the Guaranteed Obligation. Notice is hereby waived as to any such assignment by Lender.

**21.** **Revival of Guaranty.** If a claim ("Claim") is made on Lender at any time (whether before or after payment or performance in full of any Guaranteed Obligation, and whether such claim is asserted in a

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC0120N
Rev. 05/11

bankruptcy proceeding or otherwise) for repayment or recovery of any amount or other value received by Lender (from any source) in payment of, or on account of, any Guaranteed Obligation, and if Lender repays such amount, returns value or otherwise becomes liable for all or part of such Claim by reason of (a) any judgment, decree, or order of any court or administrative body or (b) any settlement or compromise of such Claim, Guarantor shall remain severally liable to Lender for the amount so repaid or returned or for which Lender is liable to the same extent as if such payments or value had never been received by Lender, despite any termination of this Guaranty or the cancellation of any note or other document evidencing any Guaranteed Obligation.

**22.**     **Captions.** The captions and section headings appearing in this Guaranty are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Guaranty.

**23.**     **Severability.** If any provision in this Guaranty is invalid and unenforceable in the jurisdiction whose law is applied to this Guaranty or in any particular context, then, to the fullest extent permitted by law, (a) the other provisions shall remain in full force and effect in such jurisdiction or context and shall be liberally construed in favor of Lender in order to carry out the parties' intentions as nearly as possible, and (b) the invalidity or unenforceability of any provision in that jurisdiction or context shall not affect the validity or enforceability of such provision in any other jurisdiction.

**24.**     **Waivers.**

       **24.1.**     **Waiver of Rights to Require Lender to Act.** Guarantor waives the right to require Lender to:

             24.1.1. Proceed against Borrower or any other person;

             24.1.2. Proceed or exhaust any security held from any person;

             24.1.3. Proceed against any other guarantor; or

             24.1.4. Pursue any other remedy available to Lender.

       **24.2.**     **Waivers Until Obligation Is Repaid.** Until the Guaranteed Obligations have been paid or otherwise discharged in full:

             24.2.1. Guarantor waives all rights of subrogation, indemnity, any rights to collect reimbursement from Borrower, and any right to enforce any remedy that Lender now has, or may have, against Borrower.

             24.2.2. Guarantor waives any benefit of, and any right to participate in, any security now or later held by Lender.

             24.2.3. Guarantor waives any defense it may have now or in the future based on any election of remedies by Lender that destroys Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, and Guarantor acknowledges that it shall be liable to Lender even though Guarantor may well have no such recourse against Borrower.

             24.2.4. Guarantor waives notice of (a) acceptance and reliance on this Guaranty; (b) notice of renewal, extension, or modification of any Guaranteed Obligation under this Guaranty; and (c) notice of default or demand in the case of default.

             24.2.5. Guarantor waives any right or defense it may now or hereafter have based on (a) Lender's full or partial release of any party who may be obligated to Lender; (b) Lender's full or partial release or impairment of any collateral for the Guaranteed Obligations; and (c) the modification or extension of the Guaranteed Obligations.

             24.2.6. Guarantor waives any and all suretyship defenses now or later available to it under Oregon law.

             24.2.7. Reserved.

             24.2.8. Guarantor waives any statute of limitation affecting liability under this Guaranty or the enforceability of this Guaranty and further waives any defense that might otherwise exist because of the expiration of the statute of limitations on the Loan Documents.

             24.2.9. Guarantor waives any duty of Lender to disclose to Guarantor any facts Lender may now know or later learn about Borrower or Borrower's financial condition regardless of whether Lender

6

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC0120N

Rev. 05/11

has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume, or has reason to believe that such facts are unknown to Guarantor, or has a reasonable opportunity to communicate such facts to Guarantor, it being understood and agreed that Guarantor is fully responsible for and is capable of being and keeping informed of Borrower's financial condition and of all circumstances bearing on the risk of nonpayment of any indebtedness guaranteed under this Guaranty.

24.2.10. Guarantor waives all notices to Guarantor.

**25.**     **Arbitration.** Concurrently herewith, Borrower and Guarantor shall execute that certain Arbitration Agreement whereby Borrower, Guarantor, and Lender agree to arbitrate any disputes to resolve any Claims (as defined in the Arbitration Agreement).

**26.**     **Jurisdiction.** The parties agree that all actions or proceedings arising in connection with this Guaranty and the other Loan Documents shall be tried and litigated only in the state courts located in the county in which notice shall be sent to Lender pursuant to this Guaranty, or the applicable federal district court that covers said county.

**27.**     **Joint and Several.** If this Guaranty is issued by more than one party or if any other party guarantees the obligations of Borrower, the obligations of Guarantor and any others under this Guaranty shall be joint and several.

**28.**     **Entire Agreement.** This Guaranty embodies the entire agreement and understanding between Guarantor and Lender pertaining to the subject matter of this Guaranty, and supersedes all prior agreements, understandings, negotiations, representations, and discussions, whether verbal or written, of the parties, pertaining to that subject matter. Guarantor is not relying on any representations, warranties, or inducements from Lender that are not expressly stated in this Guaranty.

**29.**     **Further Assurances.** Guarantor shall promptly and duly execute and deliver to Lender such further documents and assurances and take such further action as Lender may from time to time reasonably request, including, without limitation, any amendments to this Guaranty to establish and protect the rights, interests, and remedies created or intended to be created in favor of Lender.

**30.**     **Gender; Singular Includes Plural.** As used in this Guaranty, the singular includes the plural, and the masculine includes the feminine and neuter, and vice versa, if the context so requires.

**31.**     **Nonwaiver.** No provision of this Guaranty or right of Lender under this Guaranty can be waived, nor can Guarantor be released from its obligations under this Guaranty except by a writing duly executed by an authorized representative of Lender.

**32.**     **Continuing Liability.** Guarantor shall continue to be liable under this Guaranty despite the transfer by Borrower of all or any portion of the property encumbered by the Loan Documents.

**33.**     **Time Is of the Essence.** Time is of the essence under this Guaranty and any amendment, modification, or revision of this Guaranty.

**34.**     **Cumulative Rights.** The extent of Guarantor's liability and all rights, powers, and remedies of Lender under this Guaranty, and under any other agreement now or at any future time in force between Lender and Guarantor, shall be cumulative and not alternative, and such rights, powers, and remedies shall be in addition to all rights, powers, and remedies given to Lender by law. This Guaranty is in addition to and exclusive of the guaranty of any other guarantor of any indebtedness of Borrower to Lender.

**35.**     **WAIVER OF JURY TRIAL.** LENDER AND GUARANTOR WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION OR PROCEEDING WITH RESPECT TO, IN CONNECTION WITH, OR ARISING FROM THIS GUARANTY OR THE LOAN DOCUMENTS, OR ANY INSTRUMENT OR DOCUMENT DELIVERED IN CONNECTION WITH THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HERE, OR THE GUARANTY'S VALIDITY, PROTECTION, INTERPRETATION, COLLECTION, OR ENFORCEMENT, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING (INCLUDING TORT AND CLAIMS FOR BREACH OF DUTY) BETWEEN LENDER AND GUARANTOR.

**36.**     **Capitalized Terms.** Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Security Instrument executed of even date herewith.

---

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC0120N

Rev. 05/11

37. **NO ORAL AGREEMENTS.** UNDER OREGON LAW, MOST AGREEMENTS, PROMISES, AND COMMITMENTS MADE BY LENDER CONCERNING LOANS AND OTHER CREDIT EXTENSIONS WHICH ARE NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR SECURED SOLELY BY BORROWER'S RESIDENCE MUST BE IN WRITING, EXPRESS CONSIDERATION, AND BE SIGNED BY LENDER TO BE ENFORCEABLE

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty as of the date first written above.

**GUARANTOR:**

**Roy K MacMillan**
**David N. Flora**

_____      _____
Roy K MacMillan

_____      _____
David N. Flora

© 2007 Geraci Law Firm; All Rights Reserved.
Guaranty
Loan No. PC0120N

Rev. 05/11

**AGREEMENT FOR LOAN RELATED SERVICES**

THIS AGREEMENT is made effective this 15ᵗʰ day of, October 2019, by and between The Commercial Center, Inc. (hereinafter "TCC"), and LLC to be determined (hereinafter "Borrower") and Oregon Ice Entertainment, Inc., Roy McMillan and David Flora (hereinafter "Guarantor").

Borrower has commissioned TCC as its exclusive representative for the purpose of assisting Borrower in obtaining a Loan(s), including any Loan Renewals, Modifications, Extensions, Bridge Loans, Construction Loans, Refinanced Loans, Private and other related instruments and products, current, future or otherwise relating to the project described in paragraph 2 below (hereinafter "Loan").

    1.    **Duration and Scope of Exclusivity.** This exclusive Agreement shall last up to two (2) years from the effective date herein, unless terminated as provided for in paragraph 8 or as defined in paragraph 1c. During this exclusive period:

        a.    Borrower agrees to work solely and exclusively with TCC in obtaining a Loan(s) and shall not engage any other person or entity to provide loan related services for the project described in paragraph 2 herein; and

        b.    If Borrower secures a Loan(s) from any source whatsoever (which includes a source that Borrower finds independently of TCC), the fees described in paragraph 4 herein shall be immediately due and owing to TCC.

        c.    Borrower agrees that the exclusivity of this Agreement with TCC remains indefinite, when more than one loan is required and the first is achieved the following Loan(s) are exclusive to TCC. (Such as, but not limited to, Bridge Loans, Construction Loans, Private and other related instruments and products whereas they are an initial step to a take out or permanent Loan(s)).

Exhibit Teer-3, Page 1 of 7

Case 23-30250-thp11    Doc 180    Filed 11/30/23

## AGREEMENT FOR LOAN RELATED SERVICES

2. **The project.** The name of the project for which Loan is sought, the address and legal description of the project, and the names and addresses of the parties for purposes of contact and notice under this Agreement are as follows:

> The Commercial Center, Inc.
> 519 SW Park Avenue, Suite 217
> Portland, OR 97205
> Telephone: 503.402.1261
> Fax: 503.402.1266

Borrower Name:     LLC to be determined

Borrower Address:     20407 SW Borchers Drive, Sherwood, Oregon 97140

Borrower Phone Number: (503)

Guarantor Name:     Oregon Ice Entertainment, Inc., Roy McMillan and David Flora

Guarantor Address:     20407 SW Borchers Drive, Sherwood, Oregon 97140; 17815 NE Courtney Road, Newberg, Oregon 97132; 14792 SW Brooke Court, Sherwood, Oregon 97140

Project Name:     Ice Entertainment

Project Address:     20407 SW Borchers Drive, Sherwood, Oregon 97140, Property Account Number 21540, 21595, 21737, R2149076, R333295, R575461

Project Legal Description:     Attached hereto and made a part thereof.

All notices intended for Borrower shall be sent to this address unless TCC is notified in writing by Borrower of a different address. By signing this Agreement on behalf of another person or entity, Borrower acknowledges that he has full power and authority of his principal to enter into this Agreement and to accept the financing commitment sought by TCC.

3. **Borrower to provide information and payment of costs. Borrower** agrees to provide to TCC all financial information, documents, and material believed by TCC to be relevant to the Loan and warrants hereby that all such information shall be truthful and accurate. Borrower agrees that all fees and charges necessary to obtain the financing in this matter such as, but not

Exhibit Teer-3, Page 2 of 7

## AGREEMENT FOR LOAN RELATED SERVICES

limited to appraisal fees, credit report fees, attorney's fees, title policies, survey, and environmental reports shall be paid by Borrower. Borrower understands that TCC cannot begin the Loan process without this information and will provide the same to TCC in a timely manner.

4.    **TCC's Loan Fees and Best Efforts.** Borrower agrees to pay TCC a fee on any Loan. The fee shall be in an amount equal to Two and one-quarter percent 2.25% of the gross Loan amount, exclusive of the any lender's fee or pricing adjustment ("the Loan fee"). Borrower understands that the ultimate Loan source (the Investor) shall have final discretion to establish the final Loan amount, terms and fees subject to product availability and Borrower's eligibility. TCC does not warrant, represent, or guarantee that a Borrower will be able to obtain financing. However, TCC agrees to use its best efforts to obtain a Loan as requested by Borrower. Borrower understands and agrees that TCC's obligation in this regard is satisfied and completed when a Loan is presented with terms determined by Borrower to be acceptable. Although TCC agrees to continue thereafter in completing the transaction as might be needed, Borrower acknowledges that TCC's fee has been earned at the point of issuance of a verbal and/or written acceptance of terms by Borrower. TCC's Loan fee shall be due and payable immediately after Borrower's acceptance of the Loan terms. Payment of TCC's Loan fee shall be made by certifiable funds from Borrower or, at TCC's discretion, arranged and paid through the closing agent, at the time closing.

5.    **Borrower's decision not to proceed, fees owed and liquidated damages.** If, at any time after issuance of a verbal and/or written acceptance of terms by Borrower as set forth herein, if Borrower elects not to proceed with closing and funding of the transaction, or the closing and or funding fails for any reason wholly within Borrower's ability to avoid, such failure to consummate the Loan shall be considered a breach of this Agreement. The Loan fee established in paragraph 4 will be due and payable to TCC on demand. If said payment is not made within 10 days of demand, TCC is entitled to additional liquidated damages (for damage to TCC's reputation with its Investors and lenders in the amount of Three Percent (3%) of the Loan sought by TCC The Loan fee and liquidated damages fee

Exhibit Teer-3, Page 3 of 7

shall be due and payable by Borrower upon demand by TCC and shall bear interest at the rate of

Eighteen Percent per Annum (18% per Annum) from the date of Borrower's breach until paid.

**6      Non-circumvention.** Borrower agrees that, whether this agreement results in a Loan being

funded or not, Borrower, and any of its affiliated entities, agents associations, partnerships, corporations,

limited liability companies, divisions, subsidiaries, employees, or representatives (collectively

hereinafter referred to as "Affiliates") shall not circumvent, or attempt to circumvent, TCC by directly or

indirectly contacting, soliciting, promoting, consulting, or engaging in any transaction or negotiations

with any principal, agent or representative of a TCC "protected source" for a Loan on the project

described herein, or any other project for a period of five (5) years from the termination or expiration of

this Agreement. TCC's protected sources are the potential lenders, Investors, or others that TCC

introduced to Borrower in connection with the Loan and/or the project. This provision is breached by

mere contact with a TCC protected source and does not require that Borrower actually consummate a

loan transaction. In the event of a violation of this provision, the parties agree that TCC shall then be

entitled to liquidated damages (for damage to TCC's reputation and interference with its protected

sources). The liquidated damages amount will be the greater of: Fifty Thousand dollars ($50,000) or

five Percent (5%) of the highest of any Loan amount(s) procured, discussed, or estimated by

Borrower. In addition to the liquidated damages, in the event that Borrower receives a Loan from,

through, or in connection with a TCC protected source during the five (5) year non-circumvention

period, Borrower shall pay the Loan fee described in paragraph above. The Loan fee and liquidated

damages shall be due and payable on TCC's demand and shall incur interest at the rate of Eighteen

Percent per Annum (18% per year) from the date of that the violation occurred until paid.

**7.      Ownership and use of loan package; return of Borrower information.** Borrower

further agrees that the entire package of financial documents prepared by TCC in compliance with its

obligations under this Agreement and submitted by TCC on Borrower's behalf to any prospective lender

## AGREEMENT FOR LOAN RELATED SERVICES

shall be TCC's sole property to be used only by TCC in connection with its efforts to procure this Loan for Borrower. When provided to TCC by Borrower, Borrower's original documents shall be returned to Borrower. Borrower agrees that if received, it will not otherwise keep, use, submit, or avail itself of the financing package prepared by TCC in connection with this Agreement without the prior written permission of TCC. Failure by Borrower to abide by this condition shall be considered a breach of this Agreement for which TCC shall be entitled to recover damages according to paragraph above.

**8.    Termination.** TCC may terminate this Agreement at any time in its sole discretion. Borrower may terminate this Agreement at any time up to his verbal and /or written acceptance of the Loan terms. Termination of this Agreement by any party does not terminate Borrower's duty not to breach the non-circumvention provisions in paragraph 6 and/or exclusivity provisions in paragraph 1c; if Borrower breaches said provisions, he will be liable for the Loan fee and liquidated damages as described in paragraph 6.

a.    Borrower agrees that the exclusivity of this Agreement with TCC remains indefinite, when more than one loan is required and the first is achieved. The following Loan(s) are exclusive to TCC as so state in paragraph 1c.

**9.    Miscellaneous.**

a.    Where appropriate in this Agreement, the plural refers to the singular, and the masculine refers to the feminine.

b.    This Agreement shall be interpreted according to the laws of the State of Oregon in force at the time of execution of the Agreement by TCC. The parties agree that venue for enforcement of this Agreement is Multnomah County Circuit Court for the state of Oregon.

c.    If this Agreement is referred to an attorney for enforcement, whether or not actual litigation is instituted, the party successful in enforcement shall be entitled to reasonable attorney fees, statutory costs, and other actual costs reasonably incurred.

Page 5 of 7 - AGREEMENT FOR LOAN RELATED SERVICES

## AGREEMENT FOR LOAN RELATED SERVICES

d.    Each section of this Agreement shall be separately enforceable and shall survive any other section of the Agreement.

e.    This Agreement constitutes the entire agreement between all parties or parties who have signed hereto and supersedes all other agreements both written and oral. An executed signature page(s) by Borrower(s) in writing and/or via facsimile(s) and/or electronic signature(s), in part or in whole is agreed to by TCC and Borrower(s) to be an active and binding contract original. This Agreement may be modified only in writing signed by Borrower and TCC.

9.    **Guarantor.** The undersigned Guarantor herby executes and delivers this personal guaranty and hereby unconditionally, absolutely, and irrevocably guarantees and promises to pay TCC all Loan fees, liquidated damages, costs and attorney fees that may be due to TCC under this Agreement (and any modification as agreed to by Borrower and TCC). This personal guaranty is an absolute, continuing, unconditional, and irrevocable personal guaranty and will remain valid, binding and enforceable until all of Borrower's obligations to TCC have been fully paid and performed. Guarantor expressly waives all potential defenses available to a guarantor except payment and performance of the obligations in full.

# AGREEMENT FOR LOAN RELATED SERVICES

Borrower: LLC to be determined

by _____ 10-22/19
   Signature          Date

by R.K. MacMillan
   Print name

Borrower: LLC to be determined

by _____ 10-22-19
   Signature          Date

by DAVID FLORA
   Print name


Guarantor: Oregon Ice Entertainment, Inc.

by _____ 10-22-19
   Signature          Date

Guarantor: Oregon Ice Entertainment, Inc.

by _____ 10-22-19
   Signature          Date


Guarantor : Roy McMillan

by R.K. MacMillan
   Print name

Guarantor: David Flora

by DAVID FLORA
   Print name


Personally appeared before me and acknowledged this to be his/her/their voluntary act this 22

day of October , 20 19 .

_____
Notary Public of Oregon

OFFICIAL STAMP
PEGGY R. LATTA
NOTARY PUBLIC – OREGON
COMMISSION NO. 958568
MY COMMISSION EXPIRES JANUARY 30, 2021


The Commercial Center, Inc.

by _____  October 23 2019
   President            Date


Page 7 of 7 - AGREEMENT FOR LOAN RELATED SERVICES

JULIA I. MANELA, OSB#023771
Email: jmanela@wlrlaw.com
WATKINSON LAIRD RUBENSTEIN, P.C.
Attorneys at Law
1203 Willamette Street, Suite 200
PO Box 10567
Eugene, OR 97440
Telephone: 541-484-2277

Of Attorneys for Creditor PacWest Funding Inc.,
dba Precision Capital, agent for PC0120N Joint Venture

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| In re | Case No. 23-30250-thp11 (Lead Case) |
| RODA, LLC | 23-30159-thp11 |
| And | |
| Roy MacMillan | **DECLARATION OF JULIA I. MANELA IN SUPPORT OF MOTION TO APPOINT CHAPTER 11 TRUSTEE** |
| Debtors-in-Possession. | |

I, Julia I. Manela, in accordance with the provisions of 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct:

1.    I am one of the attorneys for Creditor PacWest Funding Inc., dba Precision Capital, and I make this declaration in support of its Motion to Appoint Chapter 11 Trustee.

2.    A true and complete copy of January 21, 2022, email indicating that Oregon Ice Entertainment, Inc. (**OIE**) received an EIDL Loan in the amount of $150,000 is attached as **Exhibit JIM-1**, which is incorporated by reference as though fully set forth.

///

///

DECLARATION OF JULIA I. MANELA

3.      A true and complete copy of February 21, 2022, email indicating that representations were made concerning the effort to obtain a refinance is attached as **Exhibit JIM-2**, which is incorporated by reference as though fully set forth.

4.      A true and complete copy of March 4, 2022, email indicating that the Commercial Center, Inc., a third-party broker, represented to PacWest exit financing was available if the Debtors would work with them, is attached as **Exhibit JIM-3**, which is incorporated by reference as though fully set forth.

5.      A true and compete copy of the 341 (a) transcript is attached as **Exhibit JIM-4**, which is incorporated by reference as though fully set forth.

6.      It should be noted that there are multiple entities in which Roy MacMillian has or had an ownership interest which are associated with the Ice Arena address, including one that was established after the foreclosures commenced. A true and complete copy of the Oregon Secretary of State Business Search is attached as **Exhibit JIM-5**, which is incorporated by reference as though fully set forth.

7.      Hilco's report dated October 30, 2023, indicates that uncertainty regarding the operating entity is due in part to the uncertainty about OIE. The report also indicated concern about the collection of league dues by OIE. A true and complete copy of Hilco's report dated October 30, 2023, is attached as **Exhibit JIM-6**, which is incorporated by reference as though fully set forth.

**I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on the 30th day of November 2023.**

 s/ Julia I. Manela
Julia I. Manela, OSB No. 023771

DECLARATION OF JULIA I. MANELA

**From:** Sally Leisure <sally@sallyleisure.com>
**Sent:** Friday, January 21, 2022 6:45 PM
**To:** Julia Manela <jmanela@wlrlaw.com>; Mariska Crain <mariska@precisioncapital.net>
**Subject:** RODA Secured Debt

Julia and Mariska,

In our last meeting you asked about other secured debt.  RODA has none but OIE received a $150,000 EIDL loan in January 2021; the interest rate is 3.75%; the debt is payable at $731 per month and due in 2051.  It is secured by OIE's personal property; the UCC filing is attached.

Sally Leisure
Attorney at Law
SRL Legal, LLC
sally@sallyleisure.com
503-781-8211

**From:** Sally Leisure <sally@sallyleisure.com>
**Sent:** Monday, February 21, 2022 11:25 AM
**To:** Julia Manela <jmanela@wlrlaw.com>
**Subject:** Re: Ice Rink Loan

Julia,

Thank you for reaching out to us.  I am not aware of any financing that Commercial Center might be able to arrange; none has been offered to date.  If you have received information about a loan, I'd appreciate knowing what it is.  Over the two years of working with Commercial Center, RODA has provided all requested, even though redundant, information.

About a week ago, Mariska and I discussed the possibility of Precision retaining its security interest in the excess farm property which will not be collateral for the new loan.  We are optimistic that we can obtain other financing so we won't have to rely on Precision.  I expect an answer on this by week's end.

We plan to cure the arrearage on the rink loan perhaps as soon as March 10.  Two applications for the rink refinance have been submitted; I hope to be able to provide you an update on that progress soon.

Finally, no, we will not stipulate to a receivership.

Sally

Sally


Sally Leisure
Attorney at Law
SRL Legal, LLC
sally@sallyleisure.com
503-781-8211


On Fri, Feb 18, 2022 at 1:42 PM Julia Manela <jmanela@wlrlaw.com> wrote:

> Sally:
>
> My client is being told that there is financing available through the Commercial Center. I am confused as to why your clients would not move rapidly toward securing financing given the situation. Mr. Case said his client had requested information and you clients had not provided it.

**From:** Jim Case <jcase@case-dusterhoff.com>
**Sent:** Friday, March 4, 2022 1:45 PM
**To:** Sally Leisure <sally@sallyleisure.com>
**Cc:** Julia Manela <jmanela@wlrlaw.com>
**Subject:** RE: MacMillan and Flora - Loan Proposals

Sally,

I have left telephone messages, but you have not returned my calls, nor have you responded to my email below.

It is my understanding that both loans are now in default and that Precision can no longer accept payments. Hopefully, your clients have set aside the funds that otherwise would have gone toward payments as those funds will be necessary if any sort of a take-out loan or exit financing can be expected to be approved. Payment of those funds along with an extension or modification of the Precision Loans will be necessary to move forward. It is my understanding that Precision will not grant an extension or modification unless exit financing is in place.

If your clients will simply cooperate with The Commercial Center in providing the requested information and hold the funds which otherwise would have gone for payments over the last few months, my client still has an excellent chance of delivering a product which will satisfy your clients as well as Precision. I have repeatedly provided details to you of exactly what is needed from your clients and yet I hear nothing back from you. If you need any of that detail again, I will promptly provide it.

I am not aware of anything further that can be done for your clients. My client, as should be clear by now, is in the best possible position, and perhaps the only viable position, to provide the avenues for exit financing required by Precision. Without my client's assistance it is highly unlikely that your clients will be able to avoid receivership and ultimate foreclosure. I implore you to act responsibly on behalf of your clients and get them on board with the requirements for completion.

If I do not hear from you regarding this email and the one below, we must conclude that your clients are continuing to refuse to take the required actions and supply the required information to assist themselves toward obtaining exit financing and satisfying Precision.

James D. Case
**CASE & DUSTERHOFF, LLP**
**Attorneys at Law**
The 9800 Professional Building

9800 SW Beaverton Hillsdale Hwy, Suite 200
Beaverton, Oregon 97005
Telephone: 503.641.7222
Facsimile: 503.643.6522

jcase@case-dusterhoff.com
www.case-dusterhoff.com
www.linkedin.com/pub/james-case/11/9b2/116
https://twitter.com/OregonWineLover
https://www.instagram.com/OregonWineLover/

This e-mail is for the sole use of the intended recipient(s). It contains information that is confidential and/or legally privileged. If you believe that it has been sent to you in error, please notify the sender by reply e-mail and delete the message. Any disclosure, copying, distribution or use of this information by someone other than the intended recipient is prohibited.

**From:** Jim Case
**Sent:** Monday, January 31, 2022 4:05 PM
**To:** Sally Leisure <sally@sallyleisure.com>
**Subject:** MacMillan and Flora - Loan Proposals

Sally,

Despite my prior admonitions, you have continued to interfere with my client's contract and have continued to cause your clients to be in breach of that contract.

However, as I have stated on multiple occasions, my client continues to do everything within its power to obtain financing for your clients and has in fact garnered the interest of a lender for each loan. Attached you will find proposed terms for a loan on the farm and a loan on the ice rink. My client is confident that these loans can be closed, but only if we receive what is necessary to accomplish the desired end.

Addressing that issue, the first and foremost item to be dealt with regarding the farm is getting Mr. MacMillan's credit score to 710 or higher. A direction for obtaining that goal has been previously outlined for you and is relatively straightforward. A new loan on the ice rink is a little more complicated, however, well within the ability of your clients to obtain with the requested documentation.

Please present these loan term proposals to both Mr. MacMillan and Mr. Flora. If they would like to pursue either one of them, please ask that they sign and return the proposals and begin gathering the information necessary to accomplish the goals and move toward closing the loans.

Jim

James D. Case
**CASE & DUSTERHOFF, LLP**
**Attorneys at Law**

The 9800 Professional Building
9800 SW Beaverton Hillsdale Hwy, Suite 200
Beaverton, Oregon 97005
Telephone: 503.641.7222
Facsimile: 503.643.6522

jcase@case-dusterhoff.com
www.case-dusterhoff.com
www.linkedin.com/pub/james-case/11/9b2/116
https://twitter.com/OregonWineLover
https://www.instagram.com/OregonWineLover/

This e-mail is for the sole use of the intended recipient(s). It contains information that is confidential and/or legally privileged. If you believe that it has been sent to you in error, please notify the sender by reply e-mail and delete the message. Any disclosure, copying, distribution or use of this information by someone other than the intended recipient is prohibited.

*Meeting of Creditors*

*In re: Roda, LLC*

*March 2, 2023*



**CC REPORTING AND VIDEOCONFERENCING**
101 East Broadway, Suite 300
Eugene, OR 97401
541-485-0111
www.ccreporting.com

IN THE U.S. BANKRUPTCY COURT

DISTRICT OF OREGON (PORTLAND)


In re:                    )

    RODA, LLC,            )  No. 23-30250-thp11

           Debtor,       )


                    341(a) MEETING

                    March 2, 2023


For the US Trustee:  MR. CHRISTIAN TORIMINO

For the Debtor:  MR. DOUGLAS RICKS

Debtor's Personal Representative:  MR. ROY MACMILLAN


Also Present:

MR. JOSHUA FLOOD

MR. NICHOLAS HENDERSON and MR. DAVID FLORA

MS. SALLY LEISURE

MS. JULIA MANELA


TRANSCRIBED FROM AUDIO RECORDING BY:

Ms. Eleanor G. Knapp, RPM-CSR

Exhibit JIM-4, Page 2 of 31
Case 23-30250-thp11    Doc 180    Filed 11/30/23

1                    March 2, 2023.

2                    10:00 A.M.

3                       ***

4            MR. TORIMINO:  Okay.  Today is March

5    2nd, 2023, at 10:00 a.m., and this is the time set

6    for the 341(a) meeting of creditors in the

7    bankruptcy case of Roda, LLC, 23-30250-thp11.  My

8    name is Christian Torimino.  I am a trial attorney

9    with the Office of the US Trustee.  I'm going to

10   start off by taking role, starting with Debtor's

11   attorney.

12           MR. RICKS:  Good morning.  Doug Ricks,

13   counsel for the Debtor.

14           MR. TORIMINO:  And do we have Debtor's

15   representative?

16           MR. MACMILLAN:  We do.  My name's Roy

17   MacMillan.  I'm Debtor's representative.

18           MR. TORIMINO:  Thank you,

19   Mr. MacMillan.

20           Next I understand we have Ms. Leisure

21   on the line?

22           MS. LEISURE:  Yes, I'm here.

23           MR. TORIMINO:  Okay.  And we have

24   counsel for Mr. MacMillan personally?

25           MR. FLOOD:  That's correct.  Josh

1    Flood representing Mr. MacMillan in his individual

2    Chapter 11.

3              MR. TORIMINO:  Okay.  Mr. Henderson,

4    would you like to make your appearance?

5              MR. HENDERSON:  Yes.  Good morning.

6    This is Nick Henderson on behalf of interested party

7    Dave Flora.

8              MR. TORIMINO:  Mr. Flora, are you

9    there as well?

10             MR. FLORA:  Yes, I'm here.

11             MR. TORIMINO:  Okay.  And Ms. Manela?

12             MS. MANELA:  Yes.  Julia Manela for

13   PacWest.

14             MR. TORIMINO:  And do we have anyone

15   else on the phone for the Roda, LLC, meeting of

16   creditors?

17             MS. COMBS:  Tammy Combs with the US

18   Trustee's office.

19             MR. TORIMINO:  Okay.  Thank you,

20   Tammy.

21             Okay.  So this examination is being

22   recorded.  I'll ask my questions and open it up to

23   creditors and other interested parties.  All

24   attorneys questioning the Debtor should state their

25   name and indicate who they represent.

```
 1              I believe we've already had a
 2    verification of Mr. MacMillan's identification.
 3    But, Mr. Ricks, if you could just state for the
 4    record that you did (unintelligible) for this case
 5    as well?
 6              MR. RICKS:  Yes.  This is Doug Ricks.
 7    I confirmed Mr. MacMillan's identity with a valid
 8    Oregon driver's license.
 9              MR. TORIMINO:  Thank you.  Okay.
10    Mr. MacMillan, I'm going to swear you in again for
11    purposes of this 341(a).
12
13              ROY KENNETH MACMILLAN,
14    having been first duly sworn to testify the truth,
15    the whole truth, and nothing but the truth, was
16    examined and testified as follows:
17
18                  EXAMINATION
19    BY MR. TORIMINO:
20       Q.    All right.  Can you state your full name
21    for the record?
22       A.    Roy Kenneth MacMillan.
23       Q.    Okay.  Did you read the petition,
24    schedules, Statement of Financial Affairs, and
25    related documents before they were filed with the
```

```
1    Court in this case?
2         A.    Yes, I did.
3         Q.    Did you sign each of those documents?
4         A.    Yes, I did.
5         Q.    Are you personally familiar with the
6    information contained in those documents?
7         A.    Yes, I am.
8         Q.    To the best of your knowledge, is the
9    information in those documents true and correct?
10        A.    As far as I can understand, yes.
11        Q.    Okay.  And this is the part where I
12   normally let your attorney jump in and ask, do you
13   anticipate any amendments at this point?
14             MR. RICKS:  This is Doug Ricks.  No, I
15   don't anticipate any amendments at this time.  We
16   did file an amendment to Schedule G to correct an
17   internal error in the original filed schedule.  But
18   aside from that, I don't have any anticipated
19   amendments.
20             MR. TORIMINO:  Okay.  One moment.  Ah,
21   yes.  Okay.  I didn't review that amended G
22   beforehand, but that resolves at least one of my
23   questions.  All right.
24   BY MR. TORIMINO:
25        Q.    Okay.  So, Mr. MacMillan, you own a 48.6
```

```
 1    percent membership interest in the Debtor.  Correct?
 2         A.    That's correct.
 3         Q.    And you're -- it says you're the managing
 4    member.  Is that right?
 5         A.    That's correct.
 6         Q.    What do your duties include as managing
 7    member?
 8         A.    Basically, I sign checks, authorize the
 9    bookkeeper to make utility payments, and approve any
10    maintenance that might be needed to the building.
11         Q.    Okay.  And are you involved in the
12    day-to-day management of the Debtor?
13         A.    Yes.
14         Q.    All right.  There's another membership
15    with equal interest, David Flora.  Is Mr. Flora
16    involved in the day-to-day management of the Debtor?
17         A.    Not really.
18         Q.    Okay.  What about Anne Fisher, who has the
19    remaining approximately 2 percent interest, what's
20    her role with Roda, LLC?
21         A.    She's just an investor.
22         Q.    Okay.  Did the Debtor pass any sort of
23    resolution to grant you authority to file this
24    bankruptcy?
25         A.    Yes, it did.
```

1          MR. TORIMINO:  Okay.  Mr. Ricks, can

2    you send me over a copy of that if you could?  It's

3    not a rush, just -- I'd like to cross that off the

4    list.

5          MR. RICKS:  Sure.

6    BY MR. TORIMINO:

7        Q.    Mr. MacMillan, so we are here about

8    essentially an entity that owns one piece of real

9    property.  And everything we're going to be talking

10   about is essentially relating to that skating rink

11   complex.  So I'm going to have a sort of narrower

12   set of questions than we did at your personal 341(a)

13   last week.  And obviously they are all going to be

14   related to the -- to that skating rink complex.

15          So I guess I'd like to start off by asking

16   -- we have two large claims, 1.7 -- one for 7.2

17   million to PacWest and another for 1.28 million.

18   What were the pre-petition debt service payments on

19   those two loans?

20       A.    The smaller one, we were paying it until

21   PacWest informed us that they did not want any

22   additional payments.  So that stopped I think, if I

23   recollect, in April of last year.

24       Q.    How much were the payments?

25       A.    They were -- I recollect about 15,000 a

Exhibit JIM-4, Page 8 of 31
Case 23-30250-thp11   Doc 180   Filed 11/30/23

1    month.

2        Q.    Okay.  All right.  And the larger 7.2

3    million claim?

4        A.    The -- I think the last payment was in

5    2022 in January.  I don't have anything here to

6    verify that, but it's been a while since payments

7    were made.

8        Q.    Okay.  And how much were those payments?

9        A.    It was 56- -- 56-, 57,000.  Something like

10   that.

11       Q.    Okay.  So before about January 2022 was

12   Roda current on those -- both of those monthly debt

13   payments?

14       A.    I believe so.

15       Q.    Okay.  So -- all right.  Let's talk about

16   the rental income.  Let's start off with the

17   tenants.  So we've already -- we'll be repeating

18   some of this from your previous meeting of

19   creditors, but I think some of them have different

20   names listed in this case.

21            Okay.  So let's start off with the

22   Generation Skate 808.  This is the tenant that

23   offers figure skating lessons.  Is that right?

24       A.    Generation Skate 808 is two ladies who are

25   the figure skating -- high-level figure skating

1   coaches.  And they rent a room to do dry land

2   training and classes and that type of thing.

3       Q.    Okay.  Do you personally have an ownership

4   interest in Generation Skate 808?

5       A.    No, I do not.

6       Q.    Okay.  And your Schedule G lists that

7   their lease is for 1140 a month plus common area

8   maintenance.  Do you believe that's a fair market

9   rent?

10      A.    I don't know.  I would say yes

11  (unintelligible), but that's a holdover from when we

12  bought the company.  That number was established

13  before ownership.

14      Q.    Okay.  All right.  Next tenant, Growler

15  House.  Is this Tartan House, LLC?

16      A.    Correct.

17      Q.    Okay.  And just for clarity, I'm saying

18  Growler House because that's how it's listed in

19  Schedule G in this case, but I know from the other

20  related case that this is a business that

21  Mr. MacMillan owns.

22      A.    Correct.

23      Q.    I see in Schedule G that it pays $500 per

24  month plus common area maintenance.  Do you believe

25  it's being charged fair market rent?

1      A.      Yes.  We established market rent when we

2   signed the lease.

3      Q.      Okay.  Just -- as a casual observer here,

4   $500 per month seems cheap to me.  Could you explain

5   to me why that's a reasonable rent for this tenant?

6      A.      Because it's probably all of about 35, 45

7   square feet.

8      Q.      Okay.  All right.

9      A.      It's a room -- it's a room with a bar and

10  a cooler in it.

11     Q.      All right.  Understood.  Now, the next

12  tenant I have here is Industrial Sales.  What is

13  this tenant?

14     A.      Yes.  Industrial Sales, they are a

15  manufacturer's rep that has a room on the second

16  floor.

17     Q.      Okay.  And do you have an ownership

18  interest in that tenant?

19     A.      No, I do not.

20     Q.      Do you believe $795 plus common area

21  maintenance is fair market rent for that space?

22     A.      We are currently negotiating with them to

23  redo that lease since they will be moving --

24  hopefully moving rooms.  So we're going to be

25  renegotiating market rate.

1     Q.    Okay.  And do you expect that to increase?

2     A.    Yes.

3     Q.    Next tenant, Northwest State Authorities.

4 What is this tenant?

5     A.    That's the pro shop on the first floor.

6     Q.    All right.  And do you have an ownership

7 interest in this entity?

8     A.    No, I do not.

9     Q.    Okay.  And do you believe that $2,016 per

10 month is fair market rent for that tenant?

11     A.    Again, that lease is a holdover from the

12 original ownership, and we are planning on

13 renegotiating that in the very near future.

14     Q.    And do you expect it to -- the rent to

15 increase with that renegotiation?

16     A.    Yes, particularly the CAM charges.

17     Q.    Okay.  Next we have --

18          MR. RICKS:  Let me clarify something

19 really quickly.  Is it Northwest State Authorities

20 or Northwest Skate?

21          THE WITNESS:  I believe it's Northwest

22 Skate Authority.

23          MR. RICK:  Okay.  There may be a typo

24 there, Mr. Torimino.

25 BY MR. TORIMINO:

1    Q.    Okay.  Right.  Oregon Ice Entertainment, I

2  know this is the entity that you own that's the

3  operating entity for the skating rink.  And this is

4  the amended Schedule G that -- that Mr. Ricks

5  referred to increased the rent that was listed to

6  $43,000 per month, which makes much more sense than

7  4300.

8          So how much of the 43,000, approximately,

9  in rent is utilities?

10    A.    None of it.

11    Q.    None of it.  So -- all right.  I'm going

12  to take a look really quickly at the budget that was

13  filed.  Okay.

14          So about how much are the utilities for

15  this complex in a month?

16    A.    The electric bill runs roughly --

17  somewhere between 16- and 20,000 a month depending

18  upon the time of the year and the usage.

19          The gas bill can run somewhere between

20  6,000 and 9,000.  Again, that's depending on the

21  time of year, i.e., the temperature and humidity

22  outside the building.

23    Q.    Okay.  So I'm hearing there's as much

24  as --

25    A.    And there is a water bill.  As we consume

1      a lot of water, that can run 4- to 8,000, again

2      depending on the operation, per month.

3          Q.    Okay.  So I'm trying to add these numbers

4      up in my head quickly.  But is it fair to say this

5      is somewhere around -- I don't know -- 30- to 40,000

6      a month between all those expenses?

7          A.    Yeah, I think that would be a reasonable

8      number to say the Roda expenses are in that range,

9      yes

10         Q.    All right.  And -- so then Oregon Ice

11     Entertainment pays 43,000 for rent alone.  And then

12     in addition it contributes a significant portion to

13     those 30- to 40,000 of utilities?

14         A.    Yes.  The way it was run in the past --

15     and we're renegotiating this for all the tenants.

16     But the way it was was on the base of the monthly

17     bills coming in was divided (unintelligible).  And

18     that could run from 13- to $18,000 a month for

19     Oregon Ice Entertainment.

20              MR. TORIMINO:  Okay.  Mr. Ricks, do

21     you happen to have a copy of the budget from the

22     case management documents or cash collateral motion,

23     either one, that you can pass to Mr. MacMillan?

24              MR. RICKS:  No, I don't have that here

25     with me.  Sorry.

```
 1              MR. TORIMINO:  Okay.
 2              THE WITNESS:  If it would help the
 3   Trustee, I can provide, as an example, the last
 4   three or four months' worth of invoices from Roda to
 5   OIE so he could see the numbers, if that's --
 6   BY MR. TORIMINO:
 7      Q.    I appreciate that offer, but I don't think
 8   that it's necessary.  I'm just trying to get a sense
 9   of the -- sort of the monthly income to Roda from
10   the tenants.  And I'm looking at the budget that was
11   submitted, and I only see 13,000 for CAM or other
12   fees presumably from all the tenants.  And I don't
13   see any additional amount for utilities coming in,
14   but we have an expense for utilities.
15      A.    The answer -- the answer to that question
16   -- and yes, you are correct.  As an example, the
17   dance studio, which is still an old lease from the
18   previous owner, is paying, I think, $50 a month for
19   utilities.  And we are in the process of
20   renegotiating that lease.  When Industrial Sales
21   moves to their new -- or to the proposed new office,
22   the dance studio is going to take off -- over the
23   old one, and we're renegotiating that lease to bring
24   that up to a triple net contract.
25              MR. RICKS:  And -- sorry to jump in.
```

1  This is Doug Ricks.  I guess I want to clarify that

2  on the budget you're referencing the CAM charges

3  listing was intended to capture both triple net

4  expenses and CAM charges that the Debtor is

5  collecting on account of its leases.  And as

6  Mr. MacMillan highlighted, the overall leases for

7  the facility are in need of a refresh to keep up

8  with current expenses.

9                    MR. TORIMINO:  Yeah.  Well, I guess

10  I'm -- another part of my confusion, looking at this

11  budget, is the utilities are listed at 19,000 per

12  month.  And what Mr. MacMillan has described is

13  approximately 30 to 40,000 per month in utility

14  expenses.  And if -- if only 13,000 is coming in for

15  those CAM charges and triple net leases --

16  BY MR. TORIMINO:

17      Q.    I guess, Mr. MacMillan, how much is the

18  Debtor currently losing on utility charges that

19  aren't being sort of, you know, reimbursed by or

20  paid for by the tenants outside of rent?

21      A.    I can't answer you with a direct number,

22  but I can get you that from the bookkeeper.  She has

23  that number.

24      Q.    Okay.  All right.  So next tenant,

25  Sherwood Dance Academy, do you have an ownership

1  interest in this entity?

2      A.    No, I do not.

3      Q.    All right.  And the rent listed is $4,500,

4  approximately, per month.  Do you believe that's

5  fair market rent?

6      A.    No, I do not.

7      Q.    Do you think it should be higher?

8      A.    Yes.

9      Q.    Okay.  Do you have any plans to work on

10  renegotiating it or --

11      A.    We are in negotiations with them at the

12  present moment, but that depends on what happens

13  with Industrial Sales.

14      Q.    Are they -- the two entities related or --

15      A.    No.

16      Q.    -- in the same space?

17      A.    They want additional space.  And that

18  additional space is the current Industrial Sales

19  office.  We are planning on moving Industrial Sales

20  to a new office and have a new lease with them.  As

21  the square footage for the dance studio will be

22  going up, we're renegotiating that lease totally

23  which will include CAM and triple net charges.

24      Q.    Okay.  All right.  And last tenant, Skate

25  and Skills, I recall that you own this entity and it

1    leases space and equipment for hockey practice.  Is
2    that correct?
3         A.    That's correct.
4         Q.    All right.  And the rent that's currently
5    being charged is 1825 per month plus CAM.  Do you
6    believe that's a market rate rent?
7         A.    Yes, I do.
8         Q.    All right.  And just in terms of square
9    footage, is -- how large is Skate and Skills' area
10   compared with the dance academy?
11        A.    Skate and Skills probably is about a
12   quarter -- a quarter of the size of the dance
13   studio.
14        Q.    Okay.  All right.  So do you expect to
15   reject any of the leases we just went through in
16   this bankruptcy case?
17        A.    No, I do not.
18        Q.    All right.  So let's jump to the accounts
19   receivable.  So our office has sent a request for
20   some rent rolls that will clarify these questions.
21   I'm just going to sort of ask you in a -- in a
22   general way.  You list a large amount of receivables
23   in the schedules.  Are those all from rent?
24        A.    Yes.  Well, rent and CAMs.
25        Q.    Rent and CAMS?  Okay.  And do you believe

1    that all of those receivables are collectible?

2        A.    Yes.

3        Q.    All right.  So in the balance sheet that

4    was attached to the case management documents in

5    this case, at the end of 2021 receivables for

6    tenants was 171,000.  A year later that jumped up to

7    494,000.  Do you have a sense of why that -- why the

8    receivables increased so much?

9        A.    A couple of factors.  Using the dance

10   studio as an example, there was a miscommunication

11   between the bookkeeper and the dance studio so their

12   rent was not billed or collected.  In our

13   negotiations with the dance studio, they've agreed

14   to pay all the back rent in three installments once

15   we sign the new lease.  Okay?

16       Q.    Okay.

17       A.    Sorry.

18       Q.    Well, that's -- that's surprising.

19   Collecting rent is obviously what this business

20   does.  Seems like an unusual oversight.  I guess how

21   -- I'm looking at the gap between 171 -- 171,000 in

22   receivables and 494,000 in receivables.  And the

23   dance studio can't make up -- there must be some

24   other large portion of unpaid rent that makes up

25   those receivables.

1    A.   Yes.  I'd like to make two points.

2  Originally when this was set up it was a partnership

3  between two people.  The responsibilities were split

4  between the two people.

5        Subsequent to internal problems, I ended

6  up with the responsibility late in -- early 2022 for

7  the rent and the rest of that.  Okay?

8        And so your comment about it, you know,

9  not collecting the rent is kind of questionable, I

10  agree with you totally.  And I'm trying to fix

11  things up.  But it's been extremely difficult

12  because there is some missing information.

13    Q.   Okay.  So did -- was OIE paying its rent

14  throughout 2022?

15    A.   It was paying about half the amount

16  billed, I believe, something along that line.  OIE

17  was current up through August of 2022, if I remember

18  right.

19    Q.   Okay.  All right.  So all of the unpaid

20  rent from OIE was after August 2022?

21    A.   Correct.  And that would include CAMs.

22    Q.   All right.  All right.  I'll try and do

23  some quick math in my head.  All right.  That does

24  help clarify some.

25        So, like I said, our office requested a

```
 1   breakdown of the rents.  And we're going to -- and
 2   that will be able to answer our questions on that
 3   more specifically so I won't take up too much of our
 4   time here with it.
 5              Are you able to provide a breakdown of the
 6   rents and who has and hasn't paid?
 7       A.    The answer to the question is yes.  We
 8   have an AR report for every renter so you can see
 9   over the past year when any given one was late
10   payment or whatever.
11       Q.    Okay.  Great.  All right.  So moving on to
12   the --
13              MR. RICKS:  Sorry to --
14              MR. TORIMINO:  Go ahead.
15              MR. RICKS:  Sorry.  I wanted to jump
16   in.  I don't know.  Perhaps we covered it.  I went
17   from here to a copy of the case management
18   documents.  And I guess I wanted to clarify.  At the
19   end of 2021, there was a separate listing for the AR
20   from Oregon Ice in addition to the accounts
21   receivable.  So I don't think the gap is quite so
22   substantial.
23              MR. TORIMINO:  Sorry.  One moment.
24   I'm going to take a look at that, because I was
25   curious.  Oregon Ice -- yeah.  Yeah.  Okay.  Do you
```

1    have a copy of that where Mr. MacMillan can see?

2             MR. RICKS:  Sure.

3    BY MR. TORIMINO:

4        Q.    Just taking a look at that account

5    receivable and tenants receivable number and then

6    the two from Oregon Ice number, Mr. MacMillan, is it

7    your understanding that the -- are there any amounts

8    due from Oregon Ice other than rent?

9        A.    No.  Well, rent and CAM.

10       Q.    Rent and CAM.  So do you think the other

11   -- the due from Oregon Ice amount, is that only CAM?

12       A.    No.  That's base rent and CAM.

13       Q.    Okay.  The tenants receivable up above

14   doesn't include Oregon Ice at all?

15       A.    Okay.  So the accounts receivable -- okay.

16   I'd have to verify this with the bookkeeper.  But

17   backing up, the accounts receivable, 171, I believe

18   is the rent on all the other tenants because she

19   bills those at the end of the month and she books

20   those on the balance sheet for the current month.

21            The 345 is what would be the back-owed by

22   Oregon Ice and probably not including the December

23   31st statement going up to Oregon Ice.  Does that

24   make sense to you?

25       Q.    Sort of.  Just to just clarify, that

1    tenants receivable you said does not include Oregon

2    Ice?

3       A.    No.  It would include one month of Oregon

4    Ice.

5       Q.    One month.  Okay.  Yeah.  I think that

6    this -- I think it really just does make sense for

7    us to get the documents.  And then if there's --

8    Tammy can look it over, and she can make better

9    sense of it than I can anyway.  So I'll just -- I'll

10   move on from that.  And if we have any follow-up

11   questions, I can speak with your attorney by email.

12          So I have some questions relating to your

13   Statement of Financial Affairs.  You disclosed in

14   the Statement of Financial Affairs $25,000,

15   approximately, in credit card payments shortly

16   before the case filing.  Whose name is on that

17   credit card?

18      A.    Mine.  And those were --

19      Q.    Roy MacMillan?

20      A.    And those -- and those were checks, not

21   credit cards.  Those were checks.

22      Q.    I think that the checks are disclosed

23   separately.  Let me go down and take a look.  All

24   right.  So we have, working backwards:  $9,000 on

25   January 18th; $11,000 on January 5th; 5,000 on

1    December 5th.  Are those checks or are those credit

2    card payments?

3         A.    Those are checks.

4         Q.    Checks.  From Roda to who?

5         A.    To me.

6         Q.    You personally.  Okay.

7         A.    Yeah.  From KeyBank.  They were written on

8    the KeyBank account.

9         Q.    Okay.  And I -- I'm not going to ask too

10   many follow-up questions on that because, again,

11   I've requested some documents related to your

12   (unintelligible) creditors and it's just going to be

13   easier for me to look at those documents.

14              So, let's see, there are also a number of

15   payments to yourself disclosed in the

16   (unintelligible) the bankruptcy filing.  Let's see.

17   Were those payments for legal fees?

18        A.    Well, these are -- some of these are

19   exactly the same as the ones we just discussed.

20        Q.    Okay.  And so, I guess, again, I'll --

21   I'll just say that there's -- I'd rather just look

22   at the documents, probably, than try to have a

23   conversation about where exactly the money went

24   through.

25              So, Mr. MacMillan, in the two years prior

Exhibit JIM-4, Page 24 of 31

1    to filing the bankruptcy case, have you made any

2    gifts or transferred anything worth more than $500

3    to family members or friends?

4        A.    No.

5        Q.    Have you made any transfers to companies

6    owned by family members or friends during that time?

7        A.    No, I have not.

8        Q.    And just for clarity, I'm talking about

9    you as Roda, LLC, here.

10       A.    Yeah, I understand that.  Yes.

11       Q.    Does Roda have any claims that it could

12   make against anyone, lawsuits?

13       A.    I would say not at the current moment.

14   We'll have to see how the bankruptcy proceeds.

15       Q.    Okay.  And has Roda filed all of its

16   pre-petition tax returns?

17       A.    Yes, it has.

18       Q.    And are there -- are there any outstanding

19   tax liabilities?

20       A.    No, there's not.

21       Q.    And do you understand the obligation to

22   file monthly operating reports?

23       A.    Yes, I do.

24       Q.    And just as with your case, failure to

25   file those could result in dismissal or conversion

```
1    of this case.
2        A.    I understand that.  And that's why we have
3    hired outside help and counsel to guarantee that
4    that is done.
5        Q.    Okay.  I think we have the insurance
6    documents that we need.  Were you able to set up a
7    debtor-in-possession account?
8        A.    Yes.  There is one, and it is funded by
9    transfer -- as an example, transfer of the savings
10   account has been transferred into that and the
11   savings account has been closed.
12       Q.    Okay.  So tenants are currently making
13   payments, and they're being deposited into the DIP
14   account?
15       A.    Yes.  The current rent that came in in the
16   last two weeks has been deposited in that account.
17   And we have paid some utility bills out of that
18   account.
19       Q.    Okay.  Great.  Are there any other issues
20   that have come up post-petition that you want to
21   bring to our attention?
22       A.    No, not really.
23             MR. TORIMINO:  All right.  So I'm
24   going to open it up to other creditors.  So go ahead
25   and speak up if you want to go first.
```

1           MS. MANELA:  This is Julia Manela for

2     PacWest.

3

4                     EXAMINATION

5     BY MS. MANELA:

6           Q.    I just want to go back and have you

7     clarify again.  The lease agreement between Roda and

8     Oregon Ice, isn't it -- the determination as to

9     figuring out the CAM and property tax utilities, is

10    that based on a percentage of the overall use of the

11    space?

12          A.    All -- all of the leases are based on

13    square footage usage, not including the common area.

14          Q.    Okay.  And who is in charge of figuring

15    out allocating by percentage?

16          A.    That was from the previous owner.  But as

17    we're going through each individual lease -- as an

18    example, the dance studio, that number is going to

19    change because they're changing the amount of space

20    that they are using.

21          Q.    Okay.  So for Oregon Ice Entertainment,

22    since that's your company, do you know what

23    percentage of the overall that Oregon Ice is

24    responsible for?

25          A.    71 point something, I think.

1      Q.    And so just to confirm, so all -- 71

2  percent of those charges that are hitting Roda are

3  being passed, then, to Oregon Ice.

4      A.    Yes.  In the form of CAMs, yes.

5      Q.    CAMs.  That's -- and utilities?

6      A.    Well, CAMs include utilities.

7      Q.    It includes utilities.

8      A.    Insurance.

9      Q.    And property taxes?  Okay.  And property

10  taxes as well?

11      A.    Yes.

12      Q.    Okay.  So all of that is getting passed

13  through.

14      A.    Our intent is to make everything pass

15  through.  Correct.

16      Q.    What do you mean by "intent"?  So are you

17  actually allocating those and charging them to

18  Oregon Ice?

19      A.    Well, for Oregon Ice, yes.  But I'm using

20  the dance studio as an example, the old lease, the

21  total CAMs -- utilities, insurance, property taxes

22  -- is $50 a month.

23      Q.    So at the end of the day, Roda should

24  recoup all of that front-end -- utility, taxes, CAM

25  charges -- everything that you were describing under

1  this umbrella of CAM.  So basically, Roda should net

2  that out at the end of the day.

3      A.    That is correct, when we renegotiate all

4  the leases.

5      Q.    But you don't need to renegotiate Oregon

6  Ice, do you?  Because you already -- is it going to

7  change from 71 percent?

8      A.    The square footage?  No.

9      Q.    Okay.  You're aware that the note matured

10 already that's going to PacWest.  Correct?

11     A.    Correct.

12     Q.    And that was in February of 2022.

13 Correct?

14     A.    For Roda, yes.  And I was made well aware

15 of that by PacWest when they did not want to collect

16 any more payments for my personal income tax -- or

17 my personal loan.  Sorry.

18     Q.    And you're aware your personal loan --

19 although it's a little outside of this -- matured on

20 -- in January of 2022.  Correct?

21     A.    Correct.

22            MS. MANELA:  Okay.  That's all the

23 questions I have right now.

24            MR. TORIMINO:  All right.  Does anyone

25 else have any questions right now?

 1                 MR. HENDERSON:  This is Nick
 2    Henderson.  I don't have any other questions.
 3                 MR. TORIMINO:  Okay.  Ms. Leisure, did
 4    you have any questions?
 5                 MS. LEISURE:  Not for this time.
 6                 MR. TORIMINO:  Okay.  Well, hearing
 7    that no one else has any other questions, I think we
 8    can go ahead and close this 341(a).
 9                 Thank you all for your participation,
10    and we can go off the record.
11                 (Conclusion of audio recording.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    State of Oregon    )
2                       )      ss.
3    County of Lane     )
4
5        I, Eleanor Knapp, a Certified Shorthand Reporter
6    for the State of Oregon, do hereby certify that the
7    foregoing pages 1 to 29 comprise a complete, true,
8    and accurate transcription, to the best of my
9    ability, of the audio recording provided of the
10   proceedings held in the cause previously captioned
11   and held on March 2, 2023.
12
13
14
15   Dated at Eugene, Oregon, this 29th day of November,
16   2023.
17
18
19
20
21   Eleanor Knapp, CSR-RPM
22   CSR No. 93-0262
23   Expires:  September 30, 2026
24
25



OREGON SECRETARY OF STATE
**Corporation Division**

HOME

Business Xpress | business name search | oregon business guide
license directory | business registry/renewal | forms/fees | notary public
uniform commercial code | uniform commercial code search | documents & data services

## Associated Business Search

Business Entity Names that have
 Associated Individual Name: ROY MACMILLAN
 As an associated name of any type,
 For Active and Inactive businesses.

New Search        Printer Friendly                          11-29-2023 17:45

| Record No | Entity Type | Entity Status | Assoc Type | Registry Number | Name Status | Name |
|---|---|---|---|---|---|---|
| 1 | DLLC | INA | MEM | 519380-91 | CUR | AIRWAVE LOGISTICS LLC |
| 2 | DLLC | INA | AGT | 519380-91 | CUR | AIRWAVE LOGISTICS LLC |
| 3 | DLLC | INA | AGT | 767808-90 | CUR | CHEHALEM MIST FARMS LLC |
| 4 | DLLC | INA | MGR | 767808-90 | CUR | CHEHALEM MIST FARMS LLC |
| 5 | ABN | INA | REP | 342214-81 | CUR | ENGINEERING SALES |
| 6 | ABN | INA | REG | 342214-81 | CUR | ENGINEERING SALES |
| 7 | DLLC | INA | MEM | 285655-96 | CUR | GERVAIS BIOPOWER, LLC |
| 8 | DLLC | INA | AGT | 285655-96 | CUR | GERVAIS BIOPOWER, LLC |
| 9 | ABN | INA | REG | 961251-91 | CUR | GROWLER HOUSE |
| 10 | ABN | INA | REP | 961251-91 | CUR | GROWLER HOUSE |
| 11 | ABN | INA | REP | 961252-90 | CUR | GROWLERIEA |
| 12 | ABN | INA | REG | 961252-90 | CUR | GROWLERIEA |
| 13 | ABN | INA | REP | 315595-86 | CUR | MACMILLAN & ASSOCIATES |
| 14 | DLLC | INA | AGT | 319862-92 | CUR | MACMILLAN & ASSOCIATES LLC |
| 15 | DLLC | INA | MEM | 319862-92 | CUR | MACMILLAN & ASSOCIATES LLC |
| 16 | ABN | INA | REG | 530353-91 | CUR | NORTHWEST COMLINK |
| 17 | ABN | INA | REP | 530353-91 | CUR | NORTHWEST COMLINK |
| 18 | DLLC | INA | MGR | 544665-95 | CUR | NORTHWEST COMLINK LLC |
| 19 | DLLC | INA | AGT | 544665-95 | CUR | NORTHWEST COMLINK LLC |
| 20 | ABN | INA | REG | 494941-98 | CUR | OREGON ENGINEERING INTERNATIONAL |

Case 23-30250-thp11    Doc 180    Filed 11/30/23        Exhibit JIM-5, Page 1 of 2

| 21 | ABN | INA | REP | 494941-98 | CUR | OREGON ENGINEERING INTERNATIONAL |
|---|---|---|---|---|---|---|
| 22 | DBC | INA | PRE | 1566343-97 | CUR | OREGON HOCKEY EVENT CENTER, INC. |
| 23 | DBC | INA | AGT | 1566343-97 | CUR | OREGON HOCKEY EVENT CENTER, INC. |
| 24 | DBC | INA | IDK | 1566343-97 | CUR | OREGON HOCKEY EVENT CENTER, INC. |
| 25 | ABN | INA | REP | 1834488-94 | CUR | OREGON HOCKEY GROWLERS |
| 26 | DBC | INA | PRE | 1834395-96 | CUR | OREGON HOCKEY, INC. |
| 27 | DBC | INA | SEC | 1834395-96 | CUR | OREGON HOCKEY, INC. |
| 28 | DBC | INA | IDK | 1834395-96 | CUR | OREGON HOCKEY, INC. |
| 29 | DBC | INA | AGT | 1834395-96 | CUR | OREGON HOCKEY, INC. |
| 30 | DBC | ACT | SEC | 1595253-94 | CUR | OREGON ICE ENTERTAINMENT, INC. |
| 31 | DBC | ACT | AGT | 1595253-94 | CUR | OREGON ICE ENTERTAINMENT, INC. |
| 32 | DBC | ACT | IDK | 1595253-94 | CUR | OREGON ICE ENTERTAINMENT, INC. |
| 33 | DBC | ACT | PRE | 1595253-94 | CUR | OREGON ICE ENTERTAINMENT, INC. |
| 34 | ABN | INA | REP | 1808798-93 | CUR | OREGON ICE-CATS |
| 35 | ABN | INA | REP | 1775623-95 | CUR | OREGON SNOW-CATS |
| 36 | ABN | INA | REG | 530352-92 | CUR | PDX COMLINK |
| 37 | ABN | INA | REP | 530352-92 | CUR | PDX COMLINK |
| 38 | DLLC | ACT | MEM | 1611502-98 | CUR | RODA, LLC |
| 39 | DLLC | ACT | IDK | 1611502-98 | CUR | RODA, LLC |
| 40 | DLLC | ACT | AGT | 1611502-98 | CUR | RODA, LLC |
| 41 | ABN | ACT | REP | 2114146-93 | CUR | SHERWOOD ICE ARENA |
| 42 | DLLC | INA | AGT | 1708014-93 | CUR | SKATE AND SKILLS LLC |
| 43 | DLLC | INA | IDK | 1708014-93 | CUR | SKATE AND SKILLS LLC |
| 44 | DBC | ACT | IDK | 2028429-93 | CUR | STUMPTOWN ICE, INC. |
| 45 | DBC | ACT | PRE | 2028429-93 | CUR | STUMPTOWN ICE, INC. |
| 46 | DLLC | INA | MGR | 959831-94 | CUR | TARTAN HOUSE LLC |
| 47 | DLLC | INA | AGT | 959831-94 | CUR | TARTAN HOUSE LLC |

© 2023  Oregon Secretary of State.  All Rights Reserved.

Case 23-30250-thp11    Doc 180    Filed 11/30/23

Exhibit JIM-5, Page 2 of 2

**From:** Cuticelli, Jonathan <JCuticelli@hilcoglobal.com>
**Sent:** Monday, October 30, 2023 7:00 AM
**To:** Doug Ricks <Doug@vbcattorneys.com>
**Subject:** Hilco Real Estate - Status Update

Doug,

**STATUS REPORT**
**RODA, LLC – 20407 SW Borchers Dr., Sherwood, OR**

**Advertisements of Sale**
This sale has been advertised in many different publications across a variety of media types to include print, digital, social, commercial listing sites and direct outreach:
**Print:** - Print advertisements were placed in the following publications
- Sherwood Gazette
- Portland Tribune
- RINK Magazine
- The Oregonian

**Digital:** - These advertisements include The following publication, e-mail blasts and social media posts:
- SherwoodGazette.com – Website Banner – One Month
- PortlandTribune.com – Website Banner – One Month
- LakeOswegoReview.com – Website Banner – One Month
- OregonLive.com (The Oregonian) – Digital Package (E-mail Blast & Website Impressions)
- Western Real Estate Business – E-Newsletter – 4 weeks 8x Every Tuesday & Thursday
- Hilco posted the opportunity across their main social media platforms (LinkedIn and Twitter)
- E-mail blasts - we sent it to our proprietary targeted database of 20,000+ real estate professionals, investors and decision makers that actively monitor our sales, but also to external databases and vendors we subscribe to. This is in an effort to ensure we are not missing any potential buyers:
  - **Property Send**: Compiled of over 120,000 commercial real estate brokers, commercial real estate buyers/investors, commercial real estate owners and commercial real estate developers
  - **Property Campaign**: Compiled of roughly 300,000 commercial real estate brokers, commercial real estate buyers/investors, commercial real estate owners and commercial real estate developers
  - **ePropertyPush**: Compiled of 22,449 commercial real estate brokers/professionals and commercial real estate investors
  - **Property Blast**: Compiled of over 90,000 commercial real estate buyers/investors
  - **Big Boys Blast**: Compiled of 136,500 commercial real estate brokers and commercial

real estate investors
- **CRE Push**: Compiled of an estimated 142,000 commercial real estate brokers and commercial real estate investors
- **Blast Agent**: Compiled of over 93,000+ CRE Buyers and Professionals
- **Those lists total 903,949 sends across all of these various vendor lists**

**The properties have been listed on numerous websites, including:**
- Hilco Real Estate: Sherwood Ice Arena Website Link
  - The property specific landing page has received **2,793** views with an average view time of just over 4 minutes
- CoStar.com/Loopnet.com: Link to Sherwood Ice Arena
  - This landing page has **22,397** total views and received **5,462** unique prospects since the start of marketing.
- Crexi.com: Link to Sherwood Ice Arena
  - This landing page received **4,500** impressions and **286** total page views.

**Direct Outreach** – Hilco has directly spoken to over **72** parties that have directly inquired about the opportunity.  We have answered questions, encouraged them to attend property tours, conduct their due diligence and prepare to submit a bid.

We conducted two property tours (June 1st and June 22nd) and have showed the property to **nine** (9) individual prospective buying groups.  Leading up to the bid deadline rejection was expressed in a multitude of ways, but the main points raised were as follows:
- Too much unknown with how the transition would take place from the current operator to a new operator and if the current owner/operator would be cooperative.
- How the already collected league dues would, or if the already collected league dues would, be transferred to new ownership.
- If the party didn't want to maintain an ice rink how long the process would take to get the appropriate approvals for their intended use.

With all of those hurdles we were able to generate one all-cash offer for $5,000,000.  The offer included a short 30 day due diligence period with a closing to take place on or before 30 days after the due diligence period.  That offer ultimately did not work out because they were not interested in increasing their offer over the later exercised credit bid amount.

Please let me know if you would like to discuss this further.

Best,

**Jonathan Cuticelli**
**Vice President**
Hilco Real Estate
**Mobile: (203) 561-8737**
JCuticelli@HilcoGlobal.com

www.HilcoRealEstate.com

To stay up-to-date on all Hilco Real Estate listings, please join our exclusive distribution list.

## CERTIFICATE OF SERVICE

I certify that on November 30, 2023, I served or caused to be served a true, correct, and complete copy of **MOTION TO APPOINT CHAPTER 11 TRUSTEE and the supporting DECLARATIONS OF LORENA TEER and JULIA I. MANELA** via ECF/CM to the ECF Registered Participants listed below:

**JIM BONESS** on behalf of Interested Party Intellequity Legal Services LLC
jboness@intellequityip.com

**CHRISTOPHER N COYLE** on behalf of Debtor RODA, LLC
chris@vbcattorneys.com, ecfmail@vbcattorneys.com

**JOSEPH A FIELD** on behalf of Interested Party The Commercial Center Inc
joe@fieldjerger.com, jenny@fieldjerger.com

**JOSEPH A FIELD** on behalf of Interested Party The Commercial Center, Inc.
joe@fieldjerger.com, jenny@fieldjerger.com

**JOSHUA GALLAGHER FLOOD** on behalf of Debtor Roy MacMillan
jflood@sussmanshank.com, ecf.joshua.flood@sussmanshank.com

**JOSHUA GALLAGHER FLOOD** on behalf of Interested Party Roy MacMillan
jflood@sussmanshank.com, ecf.joshua.flood@sussmanshank.com

**JOSHUA GALLAGHER FLOOD** on behalf of Jointly Administered Debtor Roy
MacMillan jflood@sussmanshank.com, ecf.joshua.flood@sussmanshank.com

**NICHOLAS J HENDERSON** on behalf of Interested Party David Flora
nhenderson@portlaw.com, pzimmerman@portlaw.com, tsexton@portlaw.com,
courtnotices@portlaw.com, hendersonnr86571@notify.bestcase.com

**SALLY LEISURE** on behalf of Creditor SRL Legal, LLC
sally@sallyleisure.com

**DOUGLAS R RICKS** on behalf of Debtor RODA, LLC
ecfmail@vbcattorneys.com, doug@vbcattorneys.com, sara@vbcattorneys.com,
ecfmail@vbcattorneys.com

**DOUGLAS R RICKS** on behalf of Interested Party Roda, LLC
ecfmail@vbcattorneys.com, doug@vbcattorneys.com, sara@vbcattorneys.com,
ecfmail@vbcattorneys.com

**THOMAS W STILLEY** on behalf of Debtor Roy MacMillan
tstilley@sussmanshank.com, jhume@sussmanshank.com,
ecf.thomas.stilley@sussmanshank.com, thomas-stilley-7866@ecf.pacerpro.com

**THOMAS W STILLEY** on behalf of Interested Party Roy MacMillan
tstilley@sussmanshank.com, jhume@sussmanshank.com,
ecf.thomas.stilley@sussmanshank.com, thomas-stilley-7866@ecf.pacerpro.com

**THOMAS W STILLEY** on behalf of Jointly Administered Debtor Roy MacMillan
tstilley@sussmanshank.com, jhume@sussmanshank.com,
ecf.thomas.stilley@sussmanshank.com, thomas-stilley-7866@ecf.pacerpro.com

**CHRISTIAN A. TORIMINO** on behalf of U.S. Trustee US Trustee, Portland
christian.torimino@usdoj.gov

**US Trustee, Portland**
USTPRegion18.PL.ECF@usdoj.gov


      I further certify that on November 30, 2023, I served or caused to be served the **MOTION TO APPOINT CHAPTER 11 TRUSTEE and the supporting DECLARATIONS OF LORENA TEER and JULIA I. MANELA** by depositing a true, exact, and complete copy in the United States Post Office at Eugene, Oregon, enclosed in a sealed envelope, with first class postage prepaid and addressed to the parties at the addresses stated below:


Sarah Baker
Hilco Real Estate, LLC
5 Revere Drive, Ste 320
Northbrook, IL 60062

Jim Boness
Intellequity Legal Services LLC
111 SW 5th Ave #3150
Portland, OR 97204

Thomas L Strong CPA PC
Attn: Thomas L. Strong
11200 SW Allen Blvd #100
Beaverton, OR 97006


WATKINSON LAIRD RUBENSTEIN, P.C.



By:  s/ Julia I. Manela
     Julia I. Manela, OSB No. 023771
     (541) 484-2277
     Of Attorneys for Creditor PacWest Funding Inc.,
     dba Precision Capital, agent for PC0120N Joint Venture